ANNE PICKARD, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6112–64.   Filed August 11, 1966.

*Leland E. Fiske*, for the petitioner.
*Sidney B. Williams*, for the respondent.

OPINION

FAY, *Judge:* Respondent determined deficiencies in petitioner's income tax for the taxable calendar year 1960 in the amount of $10,832.17.

Petitioner has conceded all issues raised by the pleadings except the following: (1) Whether petitioner realized ordinary income of $172,-800 subject to the percentage depletion allowance deduction by reason of the payment to her of that amount by Pan American Petroleum Corp.; and (2) whether petitioner is entitled to deduct in 1960 the $12,800 paid to one J. V. Fritts as a sales commission.

All of the facts were stipulated, and the facts as stipulated and exhibits attached thereto are incorporated herein by this reference.

Petitioner filed a separate income tax return for the calendar year 1960 with the district director of internal revenue, Albuquerque, N. Mex.

On September 1, 1955, petitioner acquired Government oil and gas leases No. U–016228, U–016229, and U–016231 (hereinafter referred to as the Utah leases), covering 6,400 acres of land in the State of Utah, for a period of 5 years.

On December 26, 1955, petitioner assigned one-half of lease No. U–016228 to Salvador Milan, which assigned portion was designated No. U–016228–A.   On November 30, 1956, Salvador reassigned lease No. U–016228–A to petitioner.

As a result of applications dated June 23, 1960, the Utah leases were each extended for an additional period of 5 years, to August 31, 1965.

598

Under date of January 20, 1960, petitioner executed agreements, each styled "Option for Assignment of Oil and Gas Lease," which agreements gave Pan American Petroleum Corp. (hereinafter referred to as Pan American Petroleum) the right to acquire the Utah leases by assignment within a 3-year period. Pan American Petroleum paid to petitioner the amount of $27 per acre (or a total of $172,800) in the year 1960 as consideration for options to acquire the Utah leases. The option agreement provided that Pan American Petroleum could exercise the options by the payment of an additional consideration of 10 cents per acre (or a total of $640) and a further payment of 5 percent of the value of the oil and gas produced and sold from the leases.

The option agreement also provided, *inter alia*, the following:

In the event Optionee shall elect to exercise said option any assignment acquired from Lessee shall contain the following paragraph: If the Assignee should at any time desire to release or surrender said oil and gas lease as to all or any portion of the above described lands, Assignee shall tender a reassignment of said lease as to the lands sought to be surrendered or relinquished to the Assignor at least thirty (30) days prior to the time for the payment of the next annual rental under the terms of said lease or any extension or renewal thereof or at least thirty (30) days prior to the expiration of said lease in the event the same may be extended or renewed. * * * If within a period of fifteen (15) days thereafter, Assignor shall notify Assignee that she desires the reassignment of such lease, Assignee will reassign all its interest in said lease to Assignor. In the event Assignor fails within such period of fifteen (15) days to notify Assignee that she desires reassignment of such lease, Assignee may surrender and relinquish said lease. Nothing herein contained shall in any wise affect the right of Assignee, its successors or assigns, to make any other disposition of said lease * * *

*        *        *        *        *        *        *

The Optionee is hereby granted the exclusive right during the term of this option to do and perform such geological or geophysical exploration as Optionee may desire on and in the vicinity of said land at any time hereafter and until the termination of said option, including the right to drill core holes and perform seismograph or other work thereon. * * *

If any rentals become due under said lease or lease application and prior to the expiration of said option period, Optionee shall either pay said rentals as to all of the above described land, or as to part, and relinquish this option as to the land on which Optionee elects not to pay the rentals, and Lessee shall thereupon have the election of paying said rentals as to the relinquished land and of maintaining the lease as to such land for his own account, or Lessee shall, on or before the next rental paying date ensuing after such relinquishment, timely release said lease as to such lands so relinquished to Lessee. If there is any land in said lease that is not covered by this option, Lessee agrees that he will either pay the rental on such other acreage as it falls due or make timely release of the lease as to such land so as to protect the Optionee as to the land covered by this option.

*        *        *        *        *        *        *

It is expressly understood that the consideration paid for this option is for delivery of a good and sufficient assignment of a valid lease title * * *

*        *        *        *        *        *        *

Optionee shall have the right at any time and from time to time, without Lessee's consent, to assign, transfer or convey, in whole or in part, the right and option acquired hereunder in and to all or part of the lands hereinabove described.

\*  \*  \*  \*  \*  \*  \*

The provisions hereof shall be deemed to be covenants running with the lease and binding on, and inuring to the benefit of the heirs, successors and assigns of the parties hereto.

\*  \*  \*  \*  \*  \*  \*

As to all lands described in any notice of exercise as above provided Optionee shall pay to Lessee, as overriding royalty, Five (5) % of the value, at the field market price, of the oil and gas produced, saved and sold by virtue of said lease from the lands described in said notice; provided that the owner of said overriding royalty shall be responsible for his proportionate part of all taxes levied upon or measured by production of oil and gas from said lands and Optionee may pay said taxes and deduct same from overriding royalty settlements.

There is no provision in the option agreement which imposed upon Pan American Petroleum the obligation to develop the property covered thereby.

At the end of the year 1960, Pan American Petroleum still held all of the options to acquire the Utah leases and had neither exercised nor surrendered any of these options.

Prior to the granting of the options to Pan American Petroleum, petitioner entered into an agreement with J. V. Fritts whereby, if he secured a purchaser for the leases, he would receive part of the initial consideration. Pursuant to this agreement petitioner paid Fritts, in the year 1960, an amount of $12,800.

In her Federal income tax return for the taxable year 1960, petitioner reported $112,480 as net ordinary income realized on the transfer to Pan American Petroleum of the Utah oil leases involved herein. She computed the above amount by reducing the amount received ($172,-800) from Pan American Petroleum upon granting the options by $47,520 (27½ percent depletion allowance) and $12,800 the amount paid to Fritts.

In his notice of deficiency, respondent determined, *inter alia*, that the $12,800 payment made to Fritts was a capital expenditure made in the subleasing of oil and gas leases and that such amount is not deductible as an ordinary expense as claimed.

In her petition, petitioner claimed that she had overpaid her Federal income taxes for the taxable year 1960 in the amount of $77,216.47, primarily because (1) the transfer of the Utah oil and gas leases contemplated in the option agreement to Pan American Petroleum would constitute an assignment, (2) any gain resulting therefrom would be properly taxable at capital gains rates, and (3) any tax on such gain cannot properly be incurred in 1960.

The first issue for decision is whether the $172,800 cash payment received by petitioner from Pan American Petroleum in 1960 constituted income to petitioner in that year.

It is petitioner's primary contention that the $172,800 received during 1960 is not includable in her taxable income for 1960 inasmuch as the nature of that payment could not be determined in that year.[1] Petitioner argues that she would be taxed at ordinary income rates on the $172,800 only in the event Pan American Petroleum failed to exercise the option within the prescribed period. If Pan American Petroleum exercised the option to acquire the leases, she contends, the $172,800 payment would be taxable at capital gains rates. The theory of petitioner is that the transfer contemplated by the option agreement would, if effected, constitute an assignment of the leases for tax purposes and that it would properly be considered an assignment of a capital asset.

Respondent primarily maintains that the transfer contemplated by the option agreement would not constitute an assignment of the leases for tax purposes on the grounds that petitioner would retain an "economic interest" in the property transferred.[2] The effect of a retained economic interest, respondent argues, establishes the proposed transfer as a sublease for tax purposes and therefore the $172,800 received would be taxable as ordinary income subject to the depletion allowance even if Pan American Petroleum exercised its option. Since payment would constitute ordinary income whether or not the option was exercised, the respondent would tax to petitioner in the year of receipt the $172,800 received upon execution of the option agreement.

Our task herein is to ascertain whether or not the transfer contemplated in the option agreement would effectuate, for tax purposes, an assignment or a sublease.

We note that although nowhere explicitly stated in the record, it is clear to us that, in the event Pan American Petroleum exercised its option, the initial payment of $172,800 would constitute (1) a prepayment or a partial payment of a sublease bonus or (2) a portion of the purchase price for an assignment, depending upon the ultimate characterization for tax purposes of the transfer contemplated by the option agreement. The stipulation of facts states that the—

option agreements gave Pan American Petroleum Corporation the right to acquire such leases by assignment * * * by the payment of an *additional* con-

---

[1] Where the nature and method of taxation of an amount cannot be determined in the year of receipt, taxation of such amount is postponed until the year in which said nature and method is ascertained. *Virginia Iron Coal & Coke Co.*, 37 B.T.A. 195 (1938), affd. 99 F. 2d 919 (C.A. 4, 1938) ; *Dill Co.*, 33 T.C. 196 (1959), affd. 294 F. 2d 291 (C.A. 3, 1961). The rationale of the above-cited cases is that since the payments will be treated as ordinary income if the option lapses and capital gain if it is exercised, taxation should be deferred until it can be determined which treatment—capital gain or ordinary income—will be afforded to the payments.

[2] Respondent opines that the provisions in the option agreement, which grant petitioner, in the event the proposed transfer is effectuated, (1) an overriding royalty interest in the oil and gas extracted from the leasehold property and (2) an option to reacquire the leases in the event of Pan American Petroleum's abandonment, establish an "economic interest" in petitioner.

sideration of ten cents per acre * * * and a further payment of five per cent of the value of the oil and gas produced and sold from the leases. * * * [Emphasis supplied.]

The use of the term "additional," in modifying "consideration," obviously implies that some other consideration was paid to petitioner which, here, could only be the $172,800 payment given to petitioner upon execution of the option agreement.

Whether an instrument effectuates, for purposes of local law, a sale or a lease, or an assignment or a sublease, is not persuasive from the Federal tax viewpoint in determining whether or not the taxpayer had an economic interest in the oil or gas in place. *Burton-Sutton Oil Co.* v. *Commissioner*, 328 U.S. 25 (1946). The facts of each transaction must be analyzed to determine whether, for tax purposes, the transferor has made an absolute sale or assignment or has made a lease or sublease. *Kirby Petroleum Co.* v. *Commissioner*, 326 U.S. 599 (1946), and *Commissioner* v. *Crawford*, 326 U.S. 599 (1946).

In *Commissioner* v. *Fleming*, 82 F. 2d 324 (C.A. 5, 1936), affirming 31 B.T.A. 623 (1934), it was stated that "a lessee's interest is everywhere regarded as vendible real property." It is well established that the sale of an entire interest in an oil and gas lease may qualify for capital gains treatment under the provisions of the Internal Revenue Code. Transfers of oil and gas leases have been held to be sales for tax purposes. See *Helvering* v. *Elbe Oil Land Co.*, 303 U.S. 372 (1938); *United States* v. *White*, 311 F. 2d 399 (C.A. 10, 1962); *White* v. *United States*, 254 F. Supp. 894 (D. Colo., 1966).

Although the Supreme Court has generally ruled that if an oil and gas lease is transferred for development, with a royalty or overriding interest retained, a sublease has been made for tax purposes,[3] the result appears to be different if there is no requirement for development. Just as a royalty or an overriding interest evidences a lease, so a lack of obligatory development evidences a sale.[4] In *Elbe Oil Land Co.* oil property was sold for an immediate cash payment, several deferred cash payments, and a share in the net profits, with no obligatory development required of the purchaser. The seller sought to have the transfer characterized as a sublease for tax purposes in order to get depletion allowance on the deferred payments. The Supreme Court sustained the Government and held that the transaction provided for an "absolute sale" and that the seller did not retain any interest or investment in the property transferred. In reaching its conclusion the Court stated at page 375:

---

[3] See *Palmer* v. *Bender*, 287 U.S. 551 (1933); *Burton-Sutton Oil Co.* v. *Commissioner*, 328 U.S. 25 (1946). However, some courts have held that even though a royalty is retained, the transaction may still be a sale if the parties intended a sale. See *United States* v. *White*, 311 F. 2d 399 (C.A. 10, 1962); *White* v. *United States*, 254 F. Supp. 894 (D. Colo., 1966). It seems clear that herein petitioner did intend to assign rather than sublease her leasehold interest.

[4] *Helvering* v. *Elbe Oil Land Co.*, 303 U.S. 372 (1938).

We are unable to conclude that the provision for * * * [the net profits] payment qualified in any way the effect of the transaction as an absolute sale * * *. In this view, neither the cash payments nor the agreement for a share of subsequent profits constituted an advance royalty, or a "bonus" in the nature of an advance royalty, * * *

Approximately 8 years later the Supreme Court reviewed two oil and gas cases involving transfers with retained overriding interests (*Kirby Petroleum Co.* v. *Commissioner, supra;* and *Commissioner* v. *Crawford, supra*). In each case the taxpayer-lessor was seeking depletion upon net profit payments received from the lessee under the terms of a contract where certain exploitation rights were given by the taxpayer-lessor to the lessee. The Supreme Court held that the net profit payments were subject to depletion:

In our view, the "net profit" payments * * * flow directly from the taxpayers' economic interest in the oil and partake of the quality of rent rather than of a sale price. * * *

The Supreme Court was careful to mention that the overriding interest in *Elbe Oil Land Co.* did not qualify "in any way the effect of the transaction as an absolute sale."

Shortly thereafter the Supreme Court, in *Burton-Sutton Oil Co.* v. *Commissioner, supra,* was again presented with a question involving transfers of oil and gas interests with retained overriding interest. There, the taxpayer acquired a lease requiring him to pay to the transferor of the lease 50 percent of net profits. The taxpayer sought to exclude the 50 percent net profits payments from gross income on the grounds that no sale had occurred. The Supreme Court upheld the taxpayer but took pains to distinguish *Elbe Oil Land Co.* In this regard it stated, at pages 36, 37:

The assignor, Gulf, in the assignment here involved, required [*inter alia*] the grantee to drill promptly * * *. This * * * clause did not appear in the Elbe contract. Such a transfer of rights to exploit could not, we think, properly be construed as a sale. * * *

Although several legal commentators have contended that the distinction between *Elbe Oil Land Co.* and *Burton-Sutton Oil Co.* is without substance, and moreover, that *Elbe Oil Land Co.* should be considered, for all practical purposes, as having been reversed, the Supreme Court is not loath to reverse its own opinions. Until the Supreme Court has expressly done so, we may not take the initiative. Therefore, we must respect the distinction which it made in *Burton-Sutton Oil Co.*

There are no facts of any substance that distinguish the transfer contemplated in the option agreement in the case at bar and the trans-

fer that occurred in *Elbe Oil Land Co.*[5] The major element serving to distinguish *Elbe Oil Land Co.* from *Burton-Sutton Oil Co.*—to wit, the nonexistence of a duty on the part of the transferee to develop the oil properties—equally and similarly distinguishes the instant case from *Burton-Sutton Oil Co.* and its progeny. Accordingly, *Elbe Oil Land Co.* is controlling herein and the transfer contemplated by the option agreement would, therefore, constitute a sale for tax purposes [6] in the event that it actually materialized.

We see no merit in respondent's secondary contention that the clause permitting Pan American Petroleum to perform geological or geophysical exploration upon the property covered by the option agreement resulted in a sublease of such property during the option period. Realistically interpreted, the exploration rights merely gave Pan American Petroleum the opportunity to determine the advisability of exercising its option.

Since we have determined that the transfer contemplated in the option agreement would constitute a sale or assignment for tax purposes, it follows that, in the event such transfer occurs, any gain realized therefrom would properly be taxed at capital gains rates. The transaction in issue would only incur ordinary income taxation in the event that Pan American Petroleum does not exercise its options to acquire the leases. Therefore, the nature and method of taxing the $172,800 payment received by petitioner in 1960 cannot be determined until the year in which the options expire, are exercised or released. Under the rule of *Virginia Iron Coal & Coke Co.*, 37 B.T.A. 195, and *Dill Co.*, 33 T.C. 196 (see fn. 1 hereof), the payment of $172,800 made to petitioner in 1960 by Pan American Petroleum is not properly includable in petitioner's taxable income in 1960 and taxation on such amount should be deferred until such later year or years.[7]

For the reasons stated above, we decide this issue for petitioner.

Petitioner concedes that if the amount of $172,800 is not includable in her taxable income in 1960, then the deduction claimed for payment of $12,800 to Fritts shall be disallowed in 1960.

*Decision will be entered under Rule 50.*

---

[5] We do not consider the fact that the transferor in *Elbe Oil Land Co., supra,* retained a net profits interest, whereas petitioner herein retained an interest in the value of the oil and gas produced and sold, to be of any consequence.

[6] Petitioner's right to reacquire the property covered by the option agreement in the event of abandonment by Pan American Petroleum is hardly one which, in our opinion, would qualify the proposed transfer as anything less than a sale. The option agreement is careful to state that the foregoing right does not in any way "affect the right of Assignee [Pan American Petroleum], its successors or assigns, to make any other disposition of said lease."

[7] Respondent does not question the validity of *Virginia Iron Coal & Coke Co., supra,* and *Dill Co., supra.*