GEORGE T. AND SALLIE R. HICKS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hicks v. Commissioner
Docket No. 4460-76.
United States Tax Court
T.C. Memo 1978-373; 1978 Tax Ct. Memo LEXIS 140; 37 T.C.M. (CCH) 1540; T.C.M. (RIA) 78373; September 19, 1978, Filed James W. Allen, Jr., for the petitioners. *141 Wesley J. Lynes, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined the following deficiencies in petitioners' income tax and additions to the tax: Year
Deficiency
Section 6653 (a) [1] addition
1972
$ 20,177.91
$ 1,008.89
1973
6,858.09
342.90
Due to concessions by the parties, the issues remaining for decision are: 1. Whether certain real property ("First Parcel") sold in 1972 by petitioner George Hicks was held primarily for sale to customers in the ordinary course of his trade or business; 2. Whether petitioners must recognize income of $ 15,000 in 1973 upon Communiplex's exercise of its option to reconvey certain other real property ("Second Parcel") to petitioners. 3. Whether petitioners are entitled to deduct $ 3,789.09 paid for real property taxes in 1972; 4. Whether petitioners are entitled to deduct $ 2,300 in 1972 and $ 1,375 in 1973 for business travel expenses; and 5. Whether any part of petitioners' underpayment of tax in 1972 and 1973 *142 was due to negligence or intentional disregard of rules and regulations. FINDINGS OF FACT Some of the facts have been stipulated by the parties and are found accordingly. At the time they filed their petition, George and Sallie Hicks were residents of Nashville, Tennessee. Sallie is a party only by virtue of having filed joint returns with her husband. When we hereafter refer to petitioner, we will be referring to George. Petitioner was a general contractor and farmer in the Nashville area. On October 3, 1960, June 9, 1961, and September 5, 1961, petitioner and his investment partner, Gillespie, purchased three adjoining parcels of land, totaling 162.67 acres, in the Haywood Lane area of Davidson County, Tennessee ("Haywood Lane property"). At about the time they purchased this property, petitioner and Gillespie entered into an agreement that any profits from the property would be divided 60/40, with the larger percentage going to petitioner, while losses would be shared equally. The agreement further recited that all development of the property would be petitioner's responsibility. Although their agreement referred to development of the property, neither petitioner *143 nor Gillespie ever intended to develop this property, and they, in fact, made no improvements to the property. They did not file any plans for rezoning or subdividing the property, nor did they make any efforts to sell it. Their intention with respect to this property was "to hold it for capital gain and let someone else do the developing." The reason their agreement provided for development is that this agreement was a copy of a prior agreement between petitioner and Gillespie concerning their purchase of another piece of property for development. Petitioner was to receive 60% of the profits from the Haywood Lane purchase because he found the property and was responsible for "handling" the property. This "handling" included tasks such as dealing with local authorities. In 1967 petitioner and Gillespie sold 152.67 of the 162.67 acres of the Haywood Lane property to Transnational Investors, Inc., ("Transnational"). Transnational had made an unsolicited offer to purchase the property, and intended to develop it. Transnational, however, ran into financial difficulties and defaulted on its installment purchase of the property. A foreclosure sale was held on February 12, 1971, on *144 the 102.34 acres of the property for which Transnational had not paid the purchase price. Petitioner and Gillespie repurchased this property at the foreclosure sale for $ 282,800. [2]Transnational had not made any improvements on the land purchased at the foreclosure sale. After petitioner and Gillespie reacquired the Haywood Lane property, petitioner was approached by a real estate agent who inquired whether petitioner would sell the property. Petitioner told the agent that he was willing to sell the property for $ 9,000 an acre. The agent subsequently arranged for petitioner and Gillespie to sell approximately 32 acres of the Haywood Lane property to Communiplex, Inc. The Real Estate Purchase Agreement ("Purchase Agreement") provided that the price of the property was $ 13,000 per acre, [3] with the exact acreage to be determined by survey. The approximately *145 32 acres were divided into two parcels, the first containing 15.996 acres ("First Parcel"), the second 16.474 acres ("Second Parcel"). The Purchase Agreement provided that Communiplex was to pay approximately $ 13,000 per acre cash for the First Parcel, or $ 208,598. The Purchase Agreement further provided for a cash payment of $ 25,000 for the Second Parcel, plus a note for the $ 189,162 balance due bearing interest at 7 percent per annum. Both parcels were conveyed to Communiplex, but the Installment Deed and note provided that "[in] the event this property [(being 16.474 acres that portion retained as security after December 7, 1972)] is conveyed back to the Grantors before December 7, 1973, free and unencumbered at no cost to Grantors then this note shall be cancelled." The Purcahse Agreement provided that the "closing" for the Second Parcel would be not later than one year after the date of closing of the First Parcel. In the event the purchaser exercised its *146 option to reconvey the Second Parcel, petitioner and Gillespie were entitled to keep the $ 25,000 cash payment. Petitioner and Gillespie received $ 208,598 for the First Parcel; petitioner's share of the proceeds was $ 128,438.80. In 1972 he reported his basis in the property as $ 50,995.05, and a long-term capital gain of $ 77,443.75. Petitioner did not report any income in 1972 with respect to the transaction for the Second Parcel. In summary, under the Purchase Agreement, Communiplex bought the First Parcel (15.998 acres) for cash at approximately $ 13,000 per acre. Communiplex obtained the Second Parcel at the same price per acre but also received an option to reconvey the Second Parcel. Communiplex paid down $ 25,000 cash, to be credited against the cost of the property if the purchase was closed. Communiplex had one year (until December 7, 1973) within which to exercise its option to reconvey the Second Parcel. If Communiplex exercised its option, the sellers kept the $ 25,000. In October 1973 it became obvious that Communiplex was having difficulty with its plan to develop the Second Parcel. In early November, petitioner's attorney and attorneys for Communiplex *147 began negotiations to extend Communiplex's option. The parties reached an agreement providing that Communiplex would execute a Warranty Deed reconveying the Second Parcel to petitioner and Gillespie, that Communiplex's note would be voided, and, simultaneously, that Communiplex would obtain for $ 10 an option to purchase the Second Parcel ("Purchase Option"). The Purchase Option provided that Communiplex could purchase the Secomd Parcel between January 15, 1974, and June 7, 1975, for the price of $ 204,000, plus $ 1,200 per month for each month after January 15, 1974. Subsequently, Communiplex reconveyed the deed for the Second Parcel, its note was cancelled, and it received the Purchase Option on December 27, 1973. The terms of the Purchase Option were calculated as follows: the purchase price remained $ 13,000 per acre; interest at 7 percent per annum was added from December 7, 1972, to January 15, 1974; and Communiplex received full credit against the purchase price for the previous cash payment of $ 25,000. [4] The Purchase Option provided that petitioner and Gillespie would receive the whole $ 13,000 net per acre, rather than $ 9,000 net as provided in the Purchase Agreement, *148 and Communiplex was liable for all commissions owed to agents instrumental in introducing the parties. In addition to the Haywood Lane property, petitioner had purchased numerous other parcels of land between 1955 and 1973. During the 1950's and 1960's he was active as a general contractor in the Nashville area. Some of the land which petitioner had purchased he subdivided and sold immediately; other tracts he retained. He still owns hundreds of acres of land. Petitioner is constantly looking for land to purchase on which he can make some money, and he is well known in the Nashville area as an individual who has property for sale or who might buy property. Since the late 1960's, however, petitioner has not built any houses or subdivisions. Petitioner paid $ 3,789 in real property taxes in 1972 which he did not claim *149 as a deduction on his return. [5] He did not file a valid written election to capitalize these taxes. Although he sometimes capitalized rather than deducted real property taxes allocable to jointly held property, this practice was not invariable. Petitioner did not know whether the real property taxes for the Haywood Lane property had been capitalized on his books. During the years in issue, petitioner took various business trips. Prior to each trip he estimated his expenses at $ 45 to $ 50 a day and withdrew cash from his bank for such expenses. This amount was meant to cover all expenses except lodging. Petitioner marked his destination on the checks he cashed. He kept no other record of his business travel expenses. On his returns for 1972 and 1973, petitioner claimed various deductions under the heading, "Cost of Goods Sold." Under this heading, petitioner claimed the following deductions: Deductions
1972
1973
Tractor and Bush Hog
$ 1,994.91
New Automobile (Lincoln)
$ 7,352.92
Automobile Repairs
900.33
235.92
Daughter's Wedding
125.00
Petitioner also deducted *150 the total cost of his home utilities as a business expense in both years in issue. In the statutory notice, respondent determined that petitioner held the First Parcel for sale to customers in the ordinary course of his business. As a consequence, respondent determined that the gain realized on the sale was ordinary income. In addition, respondent determined that petitioner received $ 15,000 [6] ordinary income in 1973 when Communiplex exercised its option to reconvey the Second Parcel to petitioner and Gillespie. Respondent determined that this reconveyance constituted the lapse of an option to purchase. Respondent further determined that petitioner was not entitled to claimed deductions for business travel expenses of $ 2,300 in 1972 and $ 1,375 in 1973. Respondent also determined that part of petitioner's underpayment of tax in each year was due to negligence or intentional disregard of rules and regulations. In his petition, petitioner claimed an additional deduction for real property *151 taxes paid of $ 3,789. OPINION 1. Sale of First Parcel
The first issue is whether the First Parcel of real property petitioner sold in 1972 was held primarily for sale to customers in the ordinary course of his trade or business. If, as respondent determined, the property was so held, petitioner's gain is ordinary income. On the other hand if, as petitioner contends, he held the property for investment, the gain realized is long term capital gain. [7]
Section 1221 provides that the term "capital asset" does not include "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." For purposes of this section, "primarily" means "of first importance" or "principally." Malat v. Riddell,383 U.S. 569, 672 (1966). The issue whether property is held primarily for sale to customers in the ordinary course of a taxpayer's business is purely factual. Broughton v. Commissioner,333 F. 2d 492, 494-495 (6th Cir. 1964); *152 Pritchett v. Commissioner,63 T.C. 149, 162 (1974); Maddux Construction Co. v. Commissioner,54 T.C. 1278, 1284 (1970). The burden of proof is on petitioner. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
In Pritchett,supra, we enumerated some of the factors to be considered in determining whether property is held primarily for sale to customers in the ordinary course of the taxpayer's business: Several factors have been enumerated by the courts for the determination of the question, some of which are: (1) The purpose for which the property was initially acquired; (2) the purpose for which the property was subsequently held; (3) the extent to which improvements, if any, were made to the property by the taxpayer; (4) the frequency, number, and continuity of sales; (5) the extent and nature of the transactions involved; (6) the ordinary business of the taxpayer; (7) the extent of advertising, promotion, or other active efforts used in soliciting buyers for the sale *153 of the property; (8) the listing of property with brokers; and (9) the purpose for which the property was held at the time of sale. None of the above factors are conclusive standing alone, but rather all of the factors taken as a whole govern. [Citations omitted.] 63 T.C. at 162-63, quoting Maddux Construction Co.,supra. See also Philhall Corporation v. United States,546 F. 2d 210, 214-215 (6th Cir. 1976); Broughton,supra at 495. In this case petitioner and his partner acquired the Haywood Lane property (162.67 acres, of which the First Parcel was a portion) in 1960 and 1961. Petitioner sold 152 acres to Transnational in 1967, but when Transnational defaulted on its installment purchase agreement in 1971, petitioner reacquired 102.34 acres of this property. The following year petitioner was approached by a real estate agent concerning whether this property was for sale. Subsequently a sale for cash of 15.996 acres (the First Parcel) at $ 13,000 per acre was arranged and consummated. Prior to the sale, petitioner had neither advertised nor attempted to subdivide this property, nor had petitioner listed it with any real *154 estate agents. In previous years petitioner had been active as a general contractor, although he had not built any houses or subdivided any land for several years prior to the years in issue. He admits that he has owned some real estate for development purposes, but he contends that he acquired the Haywood Lane property for investment purposes.
Petitioner has the burden of proving that he held this land as an investment; we conclude that he has met this burden. In reaching our decision, we rely on several factors. We note, first, that petitioner acquired this property 11 years prior to this sale. Municipal Bond Corporation v. Commissioner,382 F. 2d 184, 189 (8th Cir. 1967). Second, petitioner did not advertise this property as for sale, nor did he list it with a real estate agent. Pritchett,supra at 164-165; Hoover v. Commissioner,32 T.C. 618, 626 (1959). Third, this sale was initiated by the purchaser, not petitioner. Pritchett,supra at 165. Fourth, petitioner, a general contractor, made no improvements to this property. See *155 Maddux Construction Co.,supra at 1286-1287. Fifth, petitioner intended to hold this property for capital appreciation at the time he purchased it. Respondent relies on several factors which, he contends, indicate that petitioner held this property for sale to customers in the ordinary course of his trade or business. Respondent contends, first, that "[this] 15.996 acres was part of an original acquisition of 162.67 acres which was subdivided, sold, repurchased, subdivided again, and resold." Respondent's characterization of petitioner's transactions concerning this land is unsupported by the facts. Petitioner acquired the Haywood Lane property in 1960 and 1961 and sold substantially all of it to Transnational in 1967.He reacquired the property only after Transnational had defaulted on its purchase agreement. Such a reacquisition is merely a means of protecting one's investment. Petitioner then sold almost 16 acres (with an option to purchase 16 more) in a single, unsolicited transaction. Taken together, these facts do not support a characterization that petitioner purchased, subdivided and sold the Haywood Lane property. Respondent also contends that *156 petitioner advertised this land for sale through agents. In support of this contention, respondent refers to the "for sale" sign which respondent's agent photographed in the area of the Haywood Lane property. We found as a fact, however, that this "for sale" sign was on the 11 lots which petitioner acquired from Transnational's trustee in bankruptcy. Petitioner never advertised the Haywood Lane property (or the First Parcel) for sale. Respondent contends, finally, that petitioner had no trade or business other than acquiring land and holding it for sale to customers. Respondent asserts that this sale was petitioner's sole source of income in 1972, see Estate of Webb v. Commissioner,30 T.C. 1202 (1958), that petitioner was constantly searching for additional parcels of land to purchase and sell, and that petitioner was and is well known in the Nashville area as having real estate on hand for sale. Although we agree with the above facts, we are not persuaded that these factors establish that petitioner held this parcel for sale in the ordinary course of his business. To be sure, petitioner purchased, subdivided, and sold many acres of land during the 1950's *157 and 1960's, but all the facts, taken together, indicate that petitioner purchased and held the Haywood Lane property for investment, not sale to his customers. It is well settled that even though a taxpayer is a land developer, he may acquire and hold land for investment purposes. Pritchett,supra at 163. See Municipal Bond Corporation v. Commissioner,382 F. 2d 184, 188 (8th Cir. 1967). Petitioner has met his burden of proving that the Haywood Lane property was held for investment; his profits from the sale of the First Parcel are long term capital gain. 2. Option on Second Parcel
The next issue is whether, as respondent contends, petitioner must recognize income of $ 15,000 in 1973 when Communiplex exercised its option to reconvey the Second Parcel and, simultaneously, obtained an extended option to purchase the same property. Petitioner asserts that recognition should be postponed until the extended option was either exercised or lapsed. We agree with petitioner. The facts relevant to this issue are these: In 1972, Communiplex purchased 16.474 acres *158 of land (the "Second Parcel") in return for $ 25,000 cash plus its note for $ 189,162. The note and deed provided that Communiplex had one year (until December 7, 1973) within which to reconvey the Second Parcel, and if such reconveyance was made, the note would be null and void. The parties are in apparent agreement that this transaction constituted an option, and we are in accord with that view. When it became obvious that Communiplex was having difficulty with its plan to develop the Second Parcel, negotiations began for an extension of the option. Agreement was reached, and on December 27, 1973, Communiplex reconveyed the Second Parcel to petitioner and simultaneously received (for $ 10 consideration) an option to purchase ("Purchase Option") the Second Parcel. The terms of the Purchase Option were very similar to those granted in the original Purchase Agreement. [8]
The facts in this case are similar to those in Virginia Iron, Coal & Coke Co. v. Commissioner,37 B.T.A. 195 (1938), affd. 99 F. 2d 919 (4th Cir. 1938), cert. denied 307 U.S. 630 (1939). In Virginia Iron, Coal & Coke Co. one *159 of the taxpayer's subsidiaries owned 6,500 acres of mineral rights and lands. In 1930 the taxpayer entered into a written agreement with Texas Gulf Sulphur Company ("Texas") giving Texas the right to purchase either the mineral rights and lands or the subsidiary's stock. The agreement provided that Texas could retain the option from year to year until 1935 by paying $ 300,000 on August 1, 1930, and $ 125,000 on August 1 of each succeeding year. All such annual payments were to be credited as part of the purchase price in case the option was exercised at any time. The option could be continued beyond 1935 by the payment of $ 150,000 on the first day of August of each year, but such payments were not to be credited as part of the purchase price. Texas was not obligated to make any payments, and the taxpayer was to retain all payments in the event the option was not exercised. Texas made the first two payments, but it failed to make the payment due August 1, 1932. On September 21, 1932, however, a supplemental contract was entered into whcih continued the option with some modifications and changes. In 1933 Texas notified the taxpayer that the option would not be exercised and no *160 additional payments would be made. The taxpayer contended that the payments were income in the years received (1930 and 1931); respondent argued that the payments were all taxable in 1933 when the option terminated and, for the first time, it became possible to determine whether the payments would be forfeited or would be a portion of the purchase price of the properties. The Board of Tax Appeals agreed with respondent that the payments were not income until "a satisfactory determination of their character for income tax purposes can be made." 37 B.T.A. at 198; accord, Virginia Iron, Coal & Coke Co. v. Commissioner,99 F. 2d 919, 921 (4th Cir. 1938). The Board also rejected the taxpayer's argument that the payments must be recognized as income in the year (1932) that the option was permitted to lapse because "the parties, by further agreement, revived the option and continued it, so that the payments theretofore made were not forfeited at that time." 37 B.T.A. at 199. The facts in the instant case are analogous. Communiplex and petitioner *161 entered into an agreement which, although cast as a sale with an option to reconvey, granted Communiplex an option to purchase the Second Parcel. The parties then extended this option, with some modifications, upon the receipt by petitioner of additional consideration. Although the Purchase Option did not specifically so provide, the original $ 25,00 payment was in fact included within the purchase price. Furthermore, in both Virginia Iron, Coal & Coke and this case the option to purchase lapsed. In Virginia Iron, Coal & Coke the Board concluded that the fact that the option lapsed in August 1932 but was renewed on September 21, 1932, was not fatal to postponement of recognition of income; in light of the subsequent extension, recognition was postponed until it was clear whether the amount paid for the option was part of the purchase price (and eligible for capital gains treatment) or ordinary income due to the lapse of the option. This case, in which the lapse and extension were simultaneous, presents a stronger factual setting for postponement of recognition of income since the option to purchase was continued without interruption. Moreover, the policy underlying the *162 decision in Virginia Iron, Coal & Coke is applicable here. That policy is that payments for an option are not included in the grantor's income until the year in which the character of those payments can be determined. In this case, the $ 25,000 payment in the original Purchase Agreement was included in the purchase price under the subsequent Purchase Option. Had Communiplex exercised its option, petitioner would have had capital gain or loss treatment as to this portion of the price. Respondent relies on the fact that the $ 25,000 payment was petitioner's property. In any option contract the amount paid the grantor for the option becomes the grantor's property as soon as the option is granted. In fact, the grantor will retain that amount whether or not the option is exercised. The characterization of this payment, however, cannot be made until the option either lapses or is exercised. Dill Company v. Commissioner,33 T.C. 196, 200 (1959), affd. 294 F. 2d 291 (3d Cir. 1961); Koch v. Commissioner,67 T.C. 71, 86-88 (1976). Accordingly, *163 we conclude that the $ 25,000 payment was not income to petitioner in the year Communiplex reconveyed the Second Parcel to him. Rather, he must recognize income in the year that the extended option either lapsed or was exercised. 3. Real Estate Taxes
The third issue is whether petitioner is entitled to deduct $ 3,789.09 additional real property taxes in 1972. Respondent has conceded that petitioner paid this additional amount of taxes and that petitioner did not make a valid election to capitalize these taxes, but respondent contends on brief for the first time that petitioner must recompute the gain on the First Parcel. Apparently respondent believes that this tax was included in the basis of the First Parcel which petitioner sold in 1972. Petitioner contends, however, that there is no evidence whether the property tax in issue was included by him in the basis of any of the property he sold during the years in issue. As to the property taxes, respondent's sole contention prior to and at trial was that petitioner had made a valid election to capitalize these taxes. On brief respondent has abandoned this position and contends that if petitioner is entitled to this *164 deduction, the amount of gain realized on his sale of the First Parcel should be increased. Respondent's position constitutes a "new matter" on which he bears the burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure.
In reaching this conclusion, we rely on two factors. First, respondent has conceded the factual matters petitioner raised in his petition.These concessions leave respondent with no grounds to dispute the increased deduction. Cf. Tauber v. Commissioner,24 T.C. 179, 184-186 (1955). Second, the evidence needed to support respondent's new contention is different than that required to meet the position taken by respondent at trial. See Estate of Falese v. Commissioner,58 T.C. 895, 899 (1972). Originally, petitioner had to establish that he paid the tax and that he did not make a valid election to capitalize these taxes. The evidence now required is whether petitioner in fact added $ 3,789.09 property tax to the basis of the First Parcel. In Sanderling, Inc. v. Commissioner,66 T.C. 743, 758 (1976), revd. in part on factual grounds, 571 F. 2d 174 (3d Cir. 1978), we noted that *165 when both the set of facts and rationale upon which respondent relies are different, a new matter has been raised on which respondent bears the burden of proof. See also Estate of Falese v. Commissioner,supra at 899. Turning to the facts of this case, we conclude that respondent has failed to carry his burden. Respondent contends that petitioner added this tax to his basis in the 16 acres which he sold, but the only evidence is that petitioner sometimes, but not invariably, capitalized the taxes on jointly held property. Petitioner specifically testified that he did not know whether property taxes for the Haywood Lane property had been capitalized. Petitioner owned many properties, several of which (involving hundreds of acres) were jointly owned. There is no evidence that the taxes respondent concedes petitioner is entitled to deduct were added to the basis of the 16 acres which were sold. Absent such evidence, we must hold for petitioner. 4.Business Travel Expenses. The fourth issue is whether petitioner is entitled to deduct $ 2,300 in 1972 and $ 1,375 in 1973 for business travel expenses. Respondent *166 determined that petitioner failed to substantiate these expenditures in accordance with section 274, and we agree.
Section 274(d) provides that no deduction is allowable under sections 162 and 212 for any traveling expenses (including meals and lodging away from home) unless the taxpayer substantiates these expenses by adequate records. Under the regulations, section 1.274-5(b)(2), Income Tax Regs., the elements to be proved with respect to business travel are the amount, time, place and business purpose of the trip. Furthermore, substantiation of such elements is required by "adequate records." Section 1.274-5(c)(1), Income Tax Regs.Section 1.274-5(c)(2)(i), Income Tax Regs., provides that, in general, in order to meet the "adequate records" requirement the taxpayer must maintain an account book and documentary evidence for each expenditure. The documentary evidence, such as receipts or bills, is required for any expenditure for lodging while traveling away from home and for any other expenditure exceeding $ 25 (except for transportation *167 charges documentary evidence is not required if such evidence is not readily available). Section 1.274-5(c)(2)(iii), Income Tax Regs.
During the years in issue petitioner took various business trips.Prior to each trip he estimated his expenses and withdrew cash from his bank in that amount. He marked his destination on the checks that he used to obtain the cash. Petitioner apparently retained no other record of his expenditures. Petitioner testified that he used this cash for miscellaneous expenditures such as food and gasoline. We conclude that petitioner, who bears the burden of proof, has failed to meet the substantiation requirements. In particular, petitioner has failed to meet both parts of the "adequate records" requirement of section 1.274-5(c). He failed to keep any form of account book or daily record of his expenditures, and he has no documentary evidence of these expenditures. Nor has petitioner presented any evidence indicating that these expenditures were under $ 25 and, hence, exempt from the "documentary evidence" requirement of the regulations. Petitioner simply took cash with him on his travels; his estimate of his expenditures *168 is not sufficient substantiation for the purposes of section 274. 5. Negligence Penalty.
The final issue is whether any part of petitioner's underpayment of tax in 1972 and 1973 was due to negligence or intentional disregard of rules and regulations. Section 6653(a) provides for an addition to the tax of 5 percent of the underpayment of tax where any part of such underpayment is due to negligence or intentional disregard of the rules and regulations of the Internal Revenue Code. The burden of proof again rests on petitioner to rebut respondent's determination. Bixby v. Commissioner,58 T.C. 757, 791 (1972). Petitioner has conceded that he incorrectly claimed various deductions under the heading, "Cost of Goods Sold," including the cost of automobile repairs and a tractor in 1972, and the cost of a Lincoln Continental and part of the cost of his daughter's wedding in 1973. He also claimed deductions for the total cost of his home utilities as a business expense in both years.At trial he presented no evidence to explain these discrepancies. We conclude that petitioner *169 has not carried his burden of proving that these errors were not caused by his negligence. Since the penalty respondent determined must be imposed if anypart of the underpayment is due to negligence or intentional disregard of rules or regulations, we sustain respondent's determination. Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue.↩
2. Subsequent to this purchase, petitioner also reacquired 11 lots which had been developed by Transnational from Transnational's trustee in bankruptcy. These lots were near the 102 acres which had been reacquired in the foreclosure sale. Petitioner listed these lots with an agent and placed a "for sale" sign on them.↩
3. Petitioner and the real estate agent agreed that the agent would keep, as his commission, any amount received from the purchase in excess of $ 9,000 per acre (net) received by petitioner and Gillespie.↩
4. In other words, the price under the Purchase Option was calculated as follows: ↩
Purchase price per acre
$ 13,000.00
Number of acres
x 16.474
Total purchase price
$ 214,162.00
Less cash payment
25,000.00
Original note
$ 189,162.00
Interest at 7% from 12/7/72
until 1/15/74 (rounded)
14,838.00
Purchase option price
$ 204,000.00
5. He deducted $ 8,927.72 real property taxes on his 1972 return.↩
6. Respondent determined that petitioner's share of the $ 25,000 price of the original option to convey was 60% of that price, or $ 15,000. Petitioner does not dispute this calculation.↩
7. Neither party contends that section 1237 (investor's subdivision sales) is applicable to this transaction.↩
8. See note 4, supra.↩