148 T.C. No. 13

UNITED STATES TAX COURT

ESTATE OF ANDREW J. MCKELVEY, DECEASED,
BRADFORD G. PETERS, EXECUTOR, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 26830-14.                    Filed April 19, 2017.

Decedent (D) entered into variable prepaid forward contracts (original VPFCs) with two investment banks in 2007. Pursuant to the terms of the original VPFCs, the investment banks made prepaid cash payments to D, and D was obligated to deliver variable quantities of stock to the investment banks on specified future settlement dates in 2008 (original settlement dates). D treated the execution of the original VPFCs as open transactions pursuant to Rev. Rul. 2003-7, 2003-1 C.B. 363, and did not report any gain or loss for 2007.

In 2008, before the original settlement dates, D paid consideration to the investment banks to extend the settlement dates until 2010 (VPFC extensions). D did not report any gain or loss upon the execution of the VPFC extensions and continued the open transaction treatment. D died in 2008 after the execution of the VPFC extensions. R determined that the execution of the VPFC extensions in 2008 constituted sales or exchanges of property under I.R.C. sec. 1001, and thus D should have reported gain from the transactions for 2008.

Held:  D's execution of the VPFC extensions did not constitute sales or exchanges of property under I.R.C. sec. 1001, and the open transaction treatment afforded to the original VPFCs under Rev. Rul 2003-7, supra, continues until the transactions are closed by the future delivery of stock.

Held, further, D did not engage in constructive sales of stock in 2008 pursuant to I.R.C. sec. 1259.

Robert A. Rudnick, Kristen M. Garry, and Mark D. Lanpher, for petitioner.

Steven N. Balahtsis and Steven A. Sirotic, for respondent.

OPINION

RUWE, Judge:  Respondent determined a $41,257,103 deficiency in Andrew J. McKelvey's (decedent) 2008 Federal income tax.  The only issue for decision is whether modifications made in 2008 to decedent's variable prepaid forward contracts (VPFC) resulted in taxable exchanges pursuant to section 1001.[1]

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## Background

The parties submitted this case fully stipulated pursuant to Rule 122.[2] Some of the facts have been stipulated and are so found. The first amended, second, and third stipulations of fact and the attached exhibits are incorporated herein by this reference.

At the time the petition was filed, Bradford G. Peters had been appointed executor of decedent's estate by the Surrogate's Court of the State of New York, New York County.[3]

Decedent was the founder and chief executive officer of Monster Worldwide, Inc. (Monster), a company known for its website, monster.com. Monster.com helps inform job seekers of job openings that match their skills and desired geographic location. Decedent died on November 27, 2008. Bradford G. Peters is the executor of decedent's estate.

Bank of America

Effective September 11, 2007, decedent entered into a VPFC with Bank of America, N.A. (BofA), with respect to 1,765,188 shares of Monster class B

---

[2] By order dated March 10, 2016, we granted the parties' joint motion to submit case without trial pursuant to Rules 50(a) and 122(a).

[3] The parties stipulate that "[a]t the time the petition was filed, Petitioner's address was 24 Skipper Drive, West Islip, NY 11795-5044."

- 4 -

common stock owned by decedent (BofA VPFC).[4] Pursuant to the terms of the

BofA VPFC decedent received from BofA a cash prepayment of $50,943,578.31

on September 14, 2007. In exchange, decedent agreed to deliver to BofA, over the

course of 10 separate settlement dates in September 2008, up to 1,765,188

Monster shares or the cash equivalent. The actual number of Monster shares (or

the cash equivalent) required for delivery on each settlement date would vary

according to the stock market closing price of Monster shares on each specified

settlement date. Three different scenarios were contemplated in the BofA VPFC.

If the Monster stock closing price on a particular settlement date was less than or

equal to $30.4610 per share (BofA floor price), the number of Monster shares (or

cash equivalent) deliverable to BofA on the settlement date would be as follows:

| Settlement Date | Monster Shares Deliverable to BofA |
|---|---|
| 9/11/08 | 176,518 |
| 9/12/08 | 176,518 |
| 9/15/08 | 176,519 |
| 9/16/08 | 176,519 |
| 9/17/08 | 176,519 |
| 9/18/08 | 176,519 |
| 9/19/08 | 176,519 |
| 9/22/08 | 176,519 |

[4]At the close of trading on the NASDAQ on September 11, 2007, the share price of Monster was $32.91.

| | |
|---|---|
| 9/23/08 | 176,519 |
| 9/24/08 | 176,519 |

If the Monster stock closing price on a particular settlement date was greater than the BofA floor price but less than or equal to $40.5809 per share (BofA cap price), then the number of Monster shares (or cash equivalent) deliverable to BofA would be the product of:

$$176{,}519 \quad \times \quad \frac{\text{BofA floor price}}{\text{Stock closing price}}$$

The multiplier used for the September 11 and 12, 2008, settlement dates is 176,518 instead of 176,519.

If the Monster stock closing price on a particular settlement date was greater than the BofA cap price, then the number of Monster shares (or cash equivalent) deliverable to BofA would be the product of:

$$176{,}519 \quad \times \quad \frac{\text{BofA floor price} + \text{Stock closing price} - \text{BofA cap price}}{\text{Stock closing price}}$$

The multiplier used for the September 11 and 12, 2008, settlement dates is 176,518 instead of 176,519.

On each settlement date, decedent could elect to settle the VPFC by delivering the requisite number of Monster shares or the cash equivalent.

Decedent pledged 1,765,188 Monster shares to BofA to secure his obligations under the BofA VPFC but could substitute other collateral, subject to BofA's approval, at any time during the term of the VPFC.

On July 24, 2008, decedent paid BofA $3,477,949.92 in additional consideration to extend the BofA VPFC settlement dates (BofA extension), as follows:[5]

| Original BofA Settlement Date | Extended BofA Settlement Date |
| --- | --- |
| 9/11/08 | 2/1/10 |
| 9/12/08 | 2/2/10 |
| 9/15/08 | 2/3/10 |
| 9/16/08 | 2/4/10 |
| 9/17/08 | 2/5/10 |
| 9/18/08 | 2/8/10 |
| 9/19/08 | 2/9/10 |
| 9/22/08 | 2/10/10 |
| 9/23/08 | 2/11/10 |
| 9/24/08 | 2/12/10 |

The BofA extension further provides: "Except as amended herein, all other terms and conditions of the * * * [BofA VPFC] shall remain in full force and in effect."

---

[5]At the close of trading on the NASDAQ on July 24, 2008, the share price of Monster was $18.24.

Following decedent's death, petitioner settled the BofA VPFC by delivering to BofA 1,757,016 shares of Monster stock on or about May 8, 2009.[6]

Morgan Stanley

Effective September 24, 2007, decedent entered into an agreement with Morgan Stanley & Co. International plc (MSI), with respect to 4,762,000 shares of Monster common stock (MSI VPFC).[7]  Pursuant to the terms of the MSI VPFC decedent received from MSI a cash prepayment of $142,626,185.80 on September 27, 2007.  In exchange, decedent agreed to deliver to MSI, on or about September 24, 2008, up to 4,762,000 Monster shares or the cash equivalent.  The actual number of Monster shares (or cash equivalent) required for delivery would vary according to the average closing price of Monster stock on specified dates (averaging dates).  The averaging dates used to calculate the number of deliverable shares under the MSI VPFC were the same 10 settlement dates used in the original BofA VPFC.

---

[6]It appears that the original BofA VPFC provided for expedited settlement upon the occurrence of certain default or termination events, such as decedent's death.  Neither party attaches any significance to the fact that there was an event triggering settlement before the contractually specified dates.

[7]At the close of trading on the NASDAQ on September 24, 2007, the share price of Monster was $33.47.

Similar to the BofA VPFC, three different scenarios were contemplated in the MSI VPFC. If the average closing price of Monster stock over the 10 averaging dates was less than or equal to $30.894 per share (MSI floor price), then decedent would be required to deliver to MSI 4,762,000 Monster shares or the cash equivalent. If the average closing price of Monster stock over the 10 averaging dates was greater than the MSI floor price but less than or equal to $35.772 per share (MSI cap price), then the number of Monster shares (or cash equivalent) deliverable to MSI would be calculated using the following formula:

$$\frac{4,762,000 \ \times \ \text{MSI floor price}}{\text{Stock average price}}$$

If the average closing price of Monster stock over the 10 averaging dates was greater than the MSI cap price, then the number of Monster shares (or cash equivalent) deliverable to MSI would be calculated using the following formula:

$$4,762,000 \quad \times \quad \frac{\text{MSI floor price } + \text{ average price } - \text{ MSI cap price}}{\text{Stock average price}}$$

The terms of the MSI VPFC, like the terms of the BofA VPFC, provided that decedent could elect to settle the contract either by delivering the requisite number of Monster shares or by paying the cash equivalent. Decedent pledged 4,762,000 Monster shares to secure his obligations under the MSI VPFC but could substitute

other collateral, subject to MSI's approval, at any time during the term of the MSI VPFC.

On July 15, 2008, decedent paid MSI $8,190,640 in additional consideration to extend the MSI VPFC averaging and settlement date(s) (MSI extension).[8] Pursuant to the terms of the MSI extension decedent and MSI postponed the settlement date of the MSI contract from September 24, 2008, to January 15, 2010. The MSI extension also postponed the 10 averaging dates to be used for the calculation of the average closing price, as follows:

| Original MSI Averaging Date | Extended MSI Averaging Date |
|---|---|
| 9/11/08 | 1/4/10 |
| 9/12/08 | 1/5/10 |
| 9/15/08 | 1/6/10 |
| 9/16/08 | 1/7/10 |
| 9/17/08 | 1/8/10 |
| 9/18/08 | 1/11/10 |
| 9/19/08 | 1/12/10 |
| 9/22/08 | 1/13/10 |
| 9/23/08 | 1/14/10 |
| 9/24/08 | 1/15/10 |

The MSI extension further provides: "This Confirmation supplements, forms part of, and is subject to, the * * * [MSI VPFC] * * * between you and us. All

---

[8]At the close of trading on the NASDAQ on July 15, 2008, the share price of Monster was $17.28.

provisions in the * * * [MSI VPFC] govern this Confirmation except as expressly

modified below."

Following decedent's death, petitioner settled the MSI VPFC by delivering

to MSI 4,762,000 shares of Monster stock on or about August 5, 2009.[9]

Tax Return

Petitioner timely filed a Form 1040, U.S. Individual Income Tax Return, for

decedent's taxable year 2008. On August 14, 2014, respondent issued a notice of

deficiency to petitioner for decedent's taxable year 2008. Respondent determined

in the notice of deficiency that decedent, upon executing the BofA and MSI

extensions in 2008, realized a capital gain of $200,886,619. Respondent's

determined gain comprised: (1) decedent's realization of short-term capital gain

of $88,096,811.03[10] from his exchange of the VPFC extensions for the original

---

[9]It appears that the original MSI VPFC, like the original BofA VPFC, provided for expedited settlement upon the occurrence of certain default or termination events, such as decedent's death. Neither party attaches any significance to the fact that there was an event triggering settlement before the contractually specified dates. Petitioner received a $95,240 credit from MSI at settlement, and the parties do not explain and it is unclear from the record why MSI credited this amount.

[10]Respondent's computation of short-term capital gain is based on (1) decedent's holding period of the original VPFCs before extension and (2) an amount realized for each original VPFC equal to the product of (i) the number of Monster shares pledged as collateral and (ii) the excess of the floor prices under

(continued...)

VPFCs and (2) decedent's realization of $112,789,808.03 of long-term capital gain from the constructive sales of Monster shares pledged under the VPFCs.[11] Respondent's determination of long-term capital gain is based on decedent, as the founder of Monster, having zero basis in the Monster shares pledged as collateral to BofA and MSI.[12] Petitioner timely filed a petition with the Court disputing respondent's determinations in the notice of deficiency.

---

[10](...continued)
the original VPFCs over the Monster closing price on July 15, 2008, of $17.28 per share.

[11]Respondent's computation of long-term capital gain is based on (1) decedent's long-term holding period of the Monster shares, and (2) an amount realized equal to the product of (i) the number of Monster shares pledged as collateral under the original VPFCs and (ii) the Monster closing price on July 15, 2008, of $17.28 per share.

[12]Pursuant to a 2010 settlement between the Internal Revenue Service (IRS) Office of Appeals and petitioner regarding decedent's taxable year ending December 31, 2002, decedent recognized capital gain of $12,077,427 with respect to 2,500,000 Monster shares. The capital gain of $12,077,427 constitutes his basis in those 2,500,000 shares, which decedent continued to own at his death. Neither decedent nor petitioner has previously claimed as basis in connection with the disposition of Monster shares any part of the $12,077,427 in capital gain, and these shares could have been used to settle part of decedent's obligation under the VPFCs. At the time of his death, decedent owned 9,246,376 shares of Monster stock.

## Discussion

The Commissioner's determinations in the notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving that the determinations are incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Under section 7491(a), if the taxpayer provides credible evidence concerning any factual issue relevant to ascertaining the taxpayer's liability and complies with certain other requirements, the burden of proof shifts from the taxpayer to the Commissioner as to that factual issue. Our conclusions are based on a preponderance of the evidence, and thus the allocation of the burden of proof in this case is immaterial. See Estate of Bongard v. Commissioner, 124 T.C. 95, 111 (2005); McGowen v. Commissioner, T.C. Memo. 2011-186, 2011 Tax Ct. Memo LEXIS 185, at *5 n.3.

We begin our discussion by briefly explaining the financial instrument at the heart of this case, the VPFC. A standard forward contract is an executory contract in which a forward buyer agrees to purchase from a forward seller a fixed quantity of property at a fixed price, with both payment and delivery occurring on a specified future date. See Anschutz Co. v. Commissioner, 135 T.C. 78, 81 (2010), aff'd, 664 F.3d 313 (10th Cir. 2011). The VPFC is a variation of a standard forward contract, requiring the forward buyer (usually a bank) to pay a

forward price (discounted to present value) to the forward seller on the date of contract execution, rather than on the date of contract maturity.  A forward seller can use the upfront cash prepayment however he or she deems fit, but the proceeds are often used by the forward seller to diversify a concentrated stock position into other securities or financial instruments.  In exchange for the cash prepayment, the forward seller becomes obligated to deliver to the forward buyer:  (1) shares of stock that have been pledged as collateral at the inception of the contract; (2) identical shares of the stock which have not been pledged as collateral; or (3) an equivalent cash amount.  The actual number of shares (or cash equivalent) to be delivered by the forward seller is determined by a formula which takes into account changes in the market price of the underlying stock over the duration of the contract.  Id. at 81-82.

I.  Section 1001 Sale or Exchange Treatment

In Rev. Rul. 2003-7, 2003-1 C.B. 363, the IRS recognized that VPFCs are open transactions when executed and do not result in the recognition of gain or loss until future delivery.  The rationale of Rev. Rul. 2003-7, supra, is straightforward:  A taxpayer entering into a VPFC does not know the identity or amount of property that will be delivered until the future settlement date arrives and delivery is made.  In the instant case, the treatment of the original VPFCs is

not in dispute. Both parties agree that when decedent entered into the original VPFCs in 2007, the contracts satisfied the requirements of Rev. Rul. 2003-7, supra, and decedent recognized no current gain or loss.

The issue we must decide is what tax consequences, if any, occurred when decedent extended the settlement and averaging dates of the original VPFCs on July 15 and 24, 2008. Respondent argues that the extensions to the original VPFCs resulted in taxable exchanges of the original VPFCs for the MSI and BofA extensions under section 1001. Respondent also argues that the extensions to the original VPFCs resulted in constructive sales of the underlying shares of Monster stock pursuant to section 1259. Petitioner contends that the extensions to the original VPFCs merely postponed the settlement and averaging dates of the contracts, did not trigger any tax consequences to decedent, and that the "open" transaction treatment provided by Rev. Rul. 2003-7, supra, should continue until the contracts are settled by delivery of Monster stock. The parties cite no reported cases addressing the tax consequences resulting from extensions to VPFCs, and this appears to be a case of first impression in this Court.

Section 1001(c) provides that, except as otherwise provided in subtitle A, the entire amount of gain or loss on the sale or exchange of property shall be recognized. Section 1001 provides:

SEC. 1001(a). Computation of Gain or Loss.--The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized.

In situations where property is not disposed of for cash but is instead exchanged for other property, section 1.1001-1(a), Income Tax Regs., provides that the exchange is not a taxable event under section 1001 unless the exchanged properties "differ[] materially either in kind or in extent". Accordingly, in order for decedent's VPFC amendments to trigger realization of gain or loss under section 1001(a) and section 1.1001-1, Income Tax Regs., two conditions must be satisfied: (1) the original VPFCs must constitute property to decedent at the time of the extensions and (2) the property must be exchanged for other property differing materially either in kind or in extent.

A. VPFCs as Property

Section 1001 applies to the "sale or other disposition of property". Accordingly, our analysis begins by determining whether, at the time of the extensions, the VPFCs constituted "property" to decedent under section 1001. If the VPFCs were not property to decedent, section 1001 has no application, and respondent's theory fails as a matter of law. The starting point for interpreting a

statutory provision is the language of the actual statute.  See Watt v. Alaska, 451

U.S. 259, 265 (1981).  The plain meaning of the statutory language, as illuminated

by the contemporaneous legislative history, often indicates the congressional

intent behind enactment of a particular statute.  Edwards v. Aguillard, 482 U.S.

578, 594 (1987).  In the instant case, neither the statutory language of section 1001

nor the legislative history define the term "property".[13]

Black's Law Dictionary broadly defines property as "[a]ny external thing

over which the rights of possession, use, and enjoyment are exercised".  Black's

Law Dictionary 1335-1336 (9th ed. 2009).  In Dickman v. Commissioner, 465

U.S. 330 (1984), the Supreme Court discussed the meaning of the term "property"

as used in the Code's gift tax provisions:

> "Property" is more than just the physical thing--the land, the bricks,
> the mortar--it is also the sum of all the rights and powers incident to
> ownership of the physical thing.  It is the tangible and the intangible.
> Property is composed of constituent elements and of these elements
> the right to use the physical thing to the exclusion of others is the
> most essential and beneficial.  * * *

Id. at 336 (emphasis in original) (quoting Passailaigue v. United States, 224 F.

Supp. 682, 686 (M.D. Ga. 1963)).  The Supreme Court further noted that money is

---

[13]The determination of something as "property" is significant for tax
purposes.  Both the definition of a capital asset under sec. 1221(a) and the
definition of an installment sale under sec. 453(a) require that the transaction
involve "property".

a property interest and the right to use money is a property interest of "the highest order." Id.

In United States v. Craft, 535 U.S. 274, 278-279 (2002), the Supreme Court explained the roles of Federal and State law in determining whether something constitutes property for Federal tax purposes:

> A common idiom describes property as a "bundle of sticks"-- a collection of individual rights which, in certain combinations, constitute property. * * * State law determines only which sticks are in a person's bundle. Whether those sticks qualify as "property" for purposes of the federal tax lien statute is a question of federal law.

Petitioner argues that the VPFCs were not property to decedent when the extensions were executed and therefore decedent had no property that could be disposed of for gain or loss under section 1001. The crux of petitioner's argument is that decedent did not possess property rights in the original VPFCs at the time the settlement and averaging dates were extended but instead had only obligations to deliver the requisite number of shares or the cash equivalent. Petitioner argues that decedent's "only right under each VPFC was to receive the prepayment required by such contract"; however, petitioner contends that following the receipt of the prepayments "each VPFC was solely an obligation of * * * [decedent], not his property."

Respondent argues that the original VPFCs are "comprised of an integrated bundle of valuable investment and other contract rights, as well as obligations, and constituted property within the meaning of I.R.C. § 1001." Respondent argues that the original VPFCs were subject to market forces and appreciation, which are valuable investment rights. Respondent further argues that the original VPFCs also conferred contractual rights, such as the right to use the prepayment cash proceeds, the right to determine how the VPFCs would be settled (i.e., by cash or stock, and if by stock, which particular shares), and the right to substitute collateral acceptable to BofA and/or MSI at any time during the term of the contracts. Respondent contends that, even if decedent possessed primarily obligations, the original VPFCs still constituted property within the meaning of section 1001.

B. Rights or Obligations

We find that, at the time decedent extended the settlement and averaging dates of the original VPFCs, he had only obligations. When decedent executed the original VPFCs--on September 11 and 24, 2007--he contracted for the right to receive cash prepayments in exchange for his obligation to deliver shares of Monster stock (or cash equivalent) on specified future dates. However, after decedent received his cash prepayments from BofA on September 14, 2007, and

MSI on September 27, 2007, his lone right under the VPFCs was satisfied and he had no continuing right to receive anything further. Decedent executed the MSI extension on July 15, 2008, and the BofA extension on July 24, 2008, and these dates are approximately 10 months after his rights to receive cash prepayments were satisfied in full. The MSI and BofA extensions did not provide decedent with the right to receive further payments. The text of the MSI and BofA extensions provide that (1) decedent will pay additional consideration specifically for the extension of the settlement and/or averaging dates and (2) the terms of the original VPFCs remain in full force and effect. The MSI and BofA extensions do not alter any other aspects of the original VPFCs. Thus, when decedent executed the extensions, all that remained under the VPFCs was decedent's obligation to deliver shares of Monster stock or the cash equivalent.

It is true that the amount of decedent's obligation under the VPFCs could vary according to the terms of the VPFCs. That is the nature of a VPFC and a reason the original VPFCs did not result in the immediate recognition of income. Nevertheless, all decedent had (both before and after the execution of the extensions) were obligations to deliver.[14] The expert report of respondent's

[14]The extensions of the averaging and settlement dates were undoubtably valuable to decedent, which is evidenced by his payment of valuable consideration

(continued...)

expert, Hendrik Bessembinder, buttresses this conclusion. Throughout his report, Dr. Bessembinder repeatedly refers to decedent having obligations, not rights, under the VPFCs. Dr. Bessembinder's expert report also includes graphs depicting the "Value of Obligation to Deliver Shares" at various settlement prices under both the MSI and BofA VPFCs. Dr. Bessembinder introduces one such graph by stating: "Since the obligation to deliver shares comprises a liability from * * * [decedent]'s viewpoint, I display the dollar amounts as negative quantities." (Emphasis added.) Because decedent had only obligations under the contracts-- and obligations are not property--the VPFCs were not property under section 1001, and therefore section 1001 is inapplicable.

Nevertheless, respondent argues that decedent possessed three valuable rights in the original VPFCs: (1) the right to the cash prepayments; (2) the right to determine how the VPFCs would be settled (i.e., whether with stock or in cash,

---

[14](...continued)
in an arm's-length transaction for the extensions. However, decedent's execution of the extensions only postponed the averaging and settlement dates of the original VPFCs and did not change the fact that decedent's interest in the VPFCs were obligations rather than property that could be exchanged under sec. 1001.

and if stock, which specific shares); and (3) the right to substitute other collateral.[15] We will address each of respondent's arguments in turn.

Respondent first argues that decedent's right to cash prepayments constituted a valuable property right. Respondent cites our Opinion in Fed. Home Loan Mortgage Corp. v. Commissioner (FHLMC), 121 T.C. 254, 259 (2003), for the proposition that "[i]t is beyond doubt that the right to use money represents a valuable property interest." Respondent concludes from this statement that decedent's receipt of prepayment cash was a valuable property interest akin to the financing arrangement used by the taxpayer in FHLMC, and therefore the VPFCs are property under section 1001. However, respondent takes our statement in FHLMC out of context. In FHLMC, 121 T.C. at 259, the issue was whether the benefit from a taxpayer's favorable financing arrangement, which provided the taxpayer with the right to use borrowed money over a period at below-market interest rates, could constitute an intangible asset for purposes of section 167(a).

---

[15]Respondent attempts to disaggregate the VPFCs into three components: (1) a discount loan; (2) a long put option; and (3) a short call option. Although the economic value of a VPFC can be calculated by valuing these separate parts, respondent appears to argue that decedent had contract rights in each of these distinct components. We disagree. VPFCs are comprehensive financial products, and decedent did not have the ability to transact separately in discount loans or call and put options. See Chock Full O' Nuts Corp. v. United States, 453 F.2d 300, 305 (2d Cir. 1971).

Our statement in FHLMC that "the right to use money represents a valuable property interest" was part of a larger discussion concerning "the cost of using borrowed money", and FHLMC involved a unique scenario in which legislation was enacted allowing the taxpayer to go from a tax-exempt entity to a taxable entity and contained special basis provisions permitting amortization deductions. Id. at 257, 259-260. In the instant case, decedent received cash prepayments from BofA or MSI on September 14 and 27, 2007, respectively. Unlike the financing arrangement of the taxpayer in FHLMC, the prepayment cash was not lent to decedent from BofA and MSI and he had no corresponding obligation to repay it to his counterparties. Although the original VPFCs did provide decedent with a right to receive cash prepayments, once these prepayments were received on September 14 and 27, 2007, decedent was left only with obligations to deliver under the terms of the VPFCs and retained no further property rights with respect to the contracts. Thus, when decedent extended the settlement and averaging dates, on July 15 and 24, 2008, respectively, he had no right to receive anything more than what he had previously received on September 14 and 27, 2007. All decedent had under the terms of the VPFCs were obligations that might increase or decrease in amount.

Respondent next argues that decedent had the right to settle the VPFCs with stock or in cash and the right to substitute other collateral for the shares pledged to BofA and MSI. We are not persuaded by respondent's argument. The VPFCs contained contractual provisions that allowed decedent to determine his method of delivery. However, the contractual provisions allowing decedent to choose settlement with stock or in cash and to substitute collateral did not equate to property rights. These provisions had no value that decedent could dispose of in an arm's-length transaction; we cannot foresee a hypothetical buyer willing to pay value for the "right" to deliver stock or cash or the "right" to substitute collateral. Furthermore, decedent's ability to substitute collateral was not absolute; it was subject to the approval of his counterparties. Thus, these contractual provisions are not property rights but rather procedural mechanisms designed to facilitate decedent's delivery obligations. At the time decedent extended the original VPFCs, he had only delivery obligations and not property rights in the contracts. These were purely liabilities as shown in Dr. Bessembinder's expert report. We hold that the MSI and BofA extensions, executed on July 15 and 24, 2008, did not constitute exchanges of decedent's "property" in the original VPFCs under section 1001.

## II. Open Transaction Treatment

Our holding is consistent with the rationale behind the open transaction treatment afforded in Rev. Rul. 2003-7, supra. As a general rule, taxation is imposed only on the realization of gain or loss. See Lucas v. Am. Code Co., 280 U.S. 445, 449 (1930). In order to calculate gain or loss realized from a particular transaction, a taxpayer must ascertain both an amount realized and an adjusted basis. Sec. 1001(a);[16] sec. 1.1001-1(a), Income Tax Regs. Certain transactions, such as VPFCs, are afforded "open" transaction treatment because either the amount realized or the adjusted basis needed for a section 1001 calculation is not known until contract maturity. See Burnet v. Logan, 283 U.S. 404 (1931) (applying open transaction doctrine until a transaction closed). In these instances the component that is known is held in suspense and gain or loss is not realized until the missing component is determined and the transaction is properly closed. The open transaction doctrine is an exception to the usual treatment arising from a

---

[16]Sec. 1001(a) provides:

> SEC. 1001(a). Computation of Gain or Loss.--The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized.

sale or exchange of property for cash or other property.  See Dennis v.

Commissioner, 473 F.2d 274, 285 (5th Cir. 1973), aff'g 57 T.C. 352 (1971).  The

open transaction doctrine is a "rule of fairness designed to ascertain with

reasonable accuracy the amount of gain or loss realized upon an exchange, and, if

appropriate, to defer recognition thereof until the correct amounts can be

accurately determined."  Id. at 285.

In order to determine gain or loss realized from a transaction, a taxpayer

needs to readily ascertain both an amount realized and the identity and adjusted

basis of property sold, disposed of, or exchanged.  See sec. 1.1001-1(a), Income

Tax Regs.  In a VPFC, the amount realized is known to the forward seller (i.e., the

cash prepayment) at the inception of the contract, but the identity, adjusted basis,

and value of the property to be delivered (i.e., stock or cash equivalent) is not

known until settlement.  A forward seller has an obligation of future delivery that

is uncertain in amount and maintains the discretion to deliver (1) the collateralized

stock; (2) identical shares of stock which were not pledged as collateral; or (3) a

cash equivalent.  Each of these delivery options will likely result in a different

adjusted basis amount.  Thus, it is impossible to calculate gain or loss with

reasonable accuracy at the outset of a VPFC when the adjusted basis necessary for

a section 1001 calculation is uncertain.  Of course, a determination of gain or loss

under section 1001 becomes certain when a forward seller satisfies his or her delivery obligations under a VPFC by delivering shares of stock or a cash equivalent thereby closing the transaction.

On February 3, 2003, the IRS published Rev. Rul. 2003-7, supra, which approved "open" transaction treatment for VPFCs that meet certain criteria. Rev. Rul. 2003-7, supra, found that a shareholder who entered into a VPFC secured by a pledge of stock neither caused a sale of stock under section 1001 nor triggered a constructive sale under section 1259. The facts of Rev. Rul. 2003-7, supra, involved a taxpayer that held appreciated shares of a publicly traded corporation. The taxpayer entered into a VPFC with an investment bank, requiring the bank to provide an upfront cash payment in exchange for the taxpayer's agreement to deliver a variable number of shares (determined by a formula in the VPFC) at maturity. As security, the taxpayer in Rev. Rul. 2003-7, supra, pledged as collateral to the investment bank the maximum number of shares that could be required under the contract; however, the taxpayer retained the right to vote the pledged shares and to receive dividends from the stock. The VPFC was for a three-year term.[17]

---

[17]We note that decedent's extended settlement dates were also approximately three years from the dates he entered into the original VPFCs.

Pursuant to the terms of the VPFC in Rev. Rul. 2003-7, supra, the taxpayer had the unrestricted legal right to settle the contract at maturity by delivering to the investment bank: (1) the pledged shares; (2) a cash equivalent; or (3) shares other than the pledged shares. The facts of Rev. Rul. 2003-7, supra, also indicate that, at the time the parties entered into the VPFC, the taxpayer intended to settle the contract by delivering the pledged shares to the investment bank on the maturity date. However, the taxpayer was not otherwise economically compelled to deliver the pledged shares and could settle the contract using other shares or cash.

On the basis of the facts set forth in Rev. Rul. 2003-7, supra, the IRS concluded that no sale or exchange treatment under section 1001 is warranted when a taxpayer: (1) receives a fixed amount of cash; (2) simultaneously enters into an agreement to deliver on a future date a number of shares of common stock that vary significantly depending on the value of the shares on the delivery date; (3) pledges the maximum number of shares for which delivery could be required under the agreement; (4) retains the unrestricted legal right to deliver the pledged shares or to substitute cash or other shares for the pledged shares on the delivery date; and (5) is not economically compelled to deliver the pledged shares. The IRS noted in Rev. Rul. 2003-7, supra, that a different outcome might occur if the

taxpayer were subject to economic compulsion to deliver the pledged shares rather than cash or other shares. The IRS further concluded that the subject VPFC did not meet the definition of a standard forward contract under section 1259(d)(1) because the stock to be delivered at maturity was subject to "significant variation" and therefore did not cause a constructive sale under section 1259.

In the instant case, decedent did not realize gain or loss when he entered into the original BofA and MSI VPFCs--on September 11 and 24, 2007, respectively--because the contracts satisfied the requirements of Rev. Rul. 2003-7, supra, and the adjusted basis component needed for a section 1001 computation was unknown. Decedent received fixed cash prepayments from BofA and MSI of $50,943,578.31 and $142,626,185.80, respectively. Decedent agreed to deliver on a future date a number of Monster shares based upon the value of those shares on specified future dates. Decedent pledged 1,765,188 shares of Monster stock to BofA and 4,762,000 shares of Monster stock to MSI, the maximum number of shares deliverable under both contracts. Decedent retained the ability to substitute cash or other shares for the pledged shares and the discretion to settle the VPFCs in cash rather than Monster stock. The original VPFCs warranted open transaction treatment because, while the amount realized (i.e., the cash prepayments) was known at the inception of the contracts, it was uncertain how many shares

decedent would have to deliver or what stock shares decedent would use to settle the contracts at maturity, or if he would choose to discharge his delivery obligations in cash. Furthermore, if decedent chose to discharge his delivery obligations using Monster stock, it was uncertain which specific shares would be delivered and what adjusted cost basis decedent had in those shares. Accordingly, the adjusted basis component necessary for a section 1001 computation was uncertain at inception and realization of gain or loss could not be accurately determined. Both parties agree that the original VPFCs are entitled to open transaction treatment, and thus decedent realized no gain or loss upon the execution of the original contracts.

The issue is what tax consequences occurred when decedent extended the settlement and averaging dates of the original VPFCs on July 15 and 24, 2008. Respondent argues that the extensions to the original VPFCs closed the original VPFCs and that decedent should have realized gain or loss upon executing the extensions. Petitioner argues that decedent's extensions to the original VPFCs did not close the original transactions and the open transaction treatment afforded to the original VPFCs should continue until the VPFCs were settled by delivery of Monster stock on the extended settlement dates. We agree with petitioner.

The rationale for affording open transaction treatment to VPFCs is the existence of uncertainty regarding the property to be delivered at settlement. As explained above, a section 1001 computation requires both an amount realized and an adjusted basis; however, only an amount realized (i.e., the cash prepayment) was known to decedent when the original VPFCs were executed. The original VPFCs provided decedent with the discretion to settle the contracts by delivering: (1) Monster shares pledged as collateral; (2) other shares that were not pledged as collateral; or (3) a cash equivalent. Decedent had not yet discharged his delivery obligations under the original VPFCs when he executed the extensions, and the original VPFCs were still open transactions. The MSI and BofA extensions made only one change to the original VPFCs: The settlement and averaging dates were postponed. Thus, by only extending the settlement and averaging dates, the extensions did not clarify the uncertainty of which property decedent would ultimately deliver to settle the contracts. Decedent had the discretion to settle the VPFCs using stock with a higher or lower basis than the stock pledged as collateral. Because decedent's obligation to deliver a variable number of shares (or the cash equivalent) was continuing, it remained uncertain whether decedent would realize a gain or loss upon discharge of his obligations, not to mention the characterization of such gain or loss.

Although a VPFC is not an option, an option is a familiar type of open transaction from which we can distill applicable principles. <u>See</u> Rev. Rul. 78-182, 1978-1 C.B. 265; Rev. Rul. 58-234, 1958-1 C.B. 279. Upon executing the original VPFC decedent was similarly situated to the writer of a call option, as he received an upfront payment and maintained an obligation to deliver property at a future date. The writer of a call option (optionor) receives an upfront premium in exchange for the obligation to sell property at a specified strike price if the option is exercised by the option holder (optionee) by a certain date. The premium received by the optionor for writing a call is not included in income at the time of receipt but is carried in a deferred account until either (1) the option expires; (2) the option is exercised; or (3) the optionor engages in a closing transaction. Rev. Rul. 78-182, <u>supra</u>; Rev. Rul. 58-234, <u>supra</u>. If the call option is exercised, the premium received by the optionor is includable in the total amount realized when determining the optionor's total gain or loss, and the gain or loss will be characterized as either short term or long term depending on the holding period of the underlying stock. Rev. Rul. 58-234, <u>supra</u>. If the option expires unexercised, the upfront premium constitutes short-term capital gain to the optionor upon expiration. Sec. 1234(b); Rev. Rul. 78-182, <u>supra</u>. Thus, until exercise,

expiration, or termination of the option, uncertainty exists regarding the taxpayer's treatment of the option premium.

Virginia Iron Coal & Coke Co. v. Commissioner (Virginia Coal), 37 B.T.A. 195 (1938), aff'd, 99 F.2d 919 (4th Cir. 1938), and Fed. Home Loan Mortg. Corp. v. Commissioner (Freddie Mac), 125 T.C. 248 (2005), are both instructive regarding options and open transaction treatment. In Virginia Coal, 37 B.T.A. at 196, the taxpayer wrote an option in exchange for an upfront cash premium. The option contract provided the optionee with the right to extend the option from year-to-year by making annual payments to the taxpayer on or before the first day of August. Id. The optionee failed to make a timely extension payment for the third year, which allowed the option to lapse; however, the parties modified the option and agreed to continue it. Id. The Board of Tax Appeals held that the continuation of the option prevented the taxpayer from realizing gain or loss in the year of lapse because the taxpayer maintained a continuing obligation to perform. Id. at 197-198. The Board of Tax Appeals also reasoned that continuing open transaction treatment was appropriate because it was uncertain whether the premium payments would ultimately be included in the computation of gain or loss from the sale of the underlying property or would constitute income to the taxpayer in connection with the expiration of the option. Id.

In <u>Freddie Mac</u>, 125 T.C. at 253, the taxpayer entered into prior approval purchase contracts to purchase mortgages from loan originators in exchange for a nonrefundable commitment fee. The Government argued that the upfront commitment fees did not constitute option premiums because it was a virtual certainty that the transactions would be consummated. <u>Id.</u> at 265. First, we found the prior approval purchase contracts to have the economic substance of options and applied the law and policy rationale governing options. <u>Id.</u> at 264-265. Despite the high level of certainty that a transaction would be consummated, we held that some uncertainty remained whether the loan originator would exercise the right to sell the mortgage to the taxpayer, and whether the option was exercised or allowed to expire affected the tax treatment of the upfront premiums. <u>Id.</u> at 266.

In <u>Virginia Coal</u> and <u>Freddie Mac</u> we approved open transaction treatment because it was uncertain whether the options would be exercised or allowed to expire, and the uncertainty directly affected the taxpayer's treatment of the upfront option premium. In the instant case, ample uncertainty existed regarding the nature and amount of the gain or loss. When decedent entered into the original VPFCs, he had the right to receive a cash prepayment in exchange for his obligation to deliver an undetermined number of Monster shares or cash

equivalent. Although the amount of the prepayment was known to the parties at inception, the amount and character of gain or loss could not be determined until decedent determined what property he would deliver at settlement. If decedent delivered Monster shares in settlement of the VPFCs, the gain or loss would be determined by comparing the amount realized (i.e., the prepayment cash) with the basis in the particular shares delivered, and the character of the gain or loss would be determined by the holding period of the shares delivered. If decedent delivered a cash equivalent to settle the VPFCs, the gain or loss would have been determined by comparing the amount realized (i.e., the prepayment cash) to the amount paid to settle the contract. This uncertainty existed with respect to the original VPFCs, and the extensions to the VPFCs did not resolve what property decedent would deliver at settlement.

## III. Section 1259 Constructive Sale

Finally, we address respondent's argument that the extensions to the original VPFCs resulted in constructive sales under section 1259 of the Monster shares pledged as collateral to BofA and MSI.

Congress enacted section 1259 because it was concerned that taxpayers holding appreciated equity positions were entering into certain complex financial transactions without paying any tax. Anschutz Co. v. Commissioner, 135 T.C. at

109.  In the event there is a constructive sale of an appreciated financial position,[18] the taxpayer shall recognize gain as if that position were sold, assigned, or otherwise terminated at its fair market value on the date of the constructive sale. Sec. 1259(a)(1).  Section 1259(c)(1)(C) provides that the taxpayer will be treated as having made a constructive sale of an appreciated financial position if the taxpayer "enters into a future or forward contract to deliver the same or substantially identical property."  Section 1259(d)(1) defines a forward contract as "a contract to deliver a substantially fixed amount of property (including cash) for a substantially fixed price."  A forward contract that calls for the delivery of "an amount of property, such as shares of stock, that is subject to significant variation under the contract terms" is not a forward contract pursuant to section 1259 and does not result in a constructive sale of stock.  S. Rept. No. 105-33, at 125-126 (1997), 1997-4 C.B. (Vol. 2) 1067, 1205-1206.

Decedent's extensions to the original VPFCs do not constitute constructive sales under section 1259, because the original VPFCs are the only contracts subject to evaluation.  Respondent acknowledges that decedent's execution of the

_____

[18]The term "appreciated financial position" means any position with respect to stock if there would be a gain if the position were sold at its fair market value. Sec. 1259(b)(1).  Petitioner concedes that decedent's Monster stock represents an appreciated financial position at the time the original VPFCs and extensions were executed.

original VPFCs satisfied Rev. Rul. 2003-7, supra. Implicit in this acknowledgment is that the original VPFCs did not trigger constructive sales of stock under section 1259 because the original VPFCs required the future delivery of Monster stock subject to significant variation. Respondent's argument that the extensions to the original VPFCs triggered constructive sales under section 1259 is predicated upon a finding that there was an exchange of the extended VPFCs for the original VPFCs under section 1001. As we concluded above, the open transaction treatment afforded to the original VPFCs continued when decedent extended the settlement and averaging dates, and there was no exchange of property under section 1001. Accordingly, because respondent concedes that the original VPFCs were properly afforded open transaction treatment under section 1001--and because the open transaction treatment continued when decedent executed the extensions--there is no merit to respondent's contention that the extended VPFCs should be viewed as separate and comprehensive financial instruments under section 1259.

In reaching our decision, we have considered all arguments made by the parties, and to the extent not mentioned or addressed, they are irrelevant or without merit.

To reflect the foregoing,

Decision will be entered

for petitioner.