VIRGINIA IRON COAL & COKE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 87010. Promulgated January 26, 1938.

*P. B. Kavanagh, Esq.*, for the petitioner.
*D. A. Taylor, Esq.*, for the respondent.

OPINION.

MURDOCK: The Commissioner determined for the year 1933 a deficiency of $51,178.95 in income tax and a deficiency of $4,229.42 in excess profits tax of the petitioner and its affiliated companies. The sole issue for decision is whether or not the Commissioner erred in including in consolidated income for 1933, $425,000 representing payments received by the affiliated companies in prior years under a contract with the Texas Gulf Sulphur Co. The facts have been stipulated and no findings of fact need be made.

The petitioner owned practically all of the stock of its subsidiary, the New York & Virginia Mining & Mineral Co., hereinafter referred to as Mineral. Mineral owned about 6,500 acres of mineral lands and rights in Carroll County, Virginia. The petitioner, on July 7, 1930, entered into a written contract with the Texas Gulf Sulphur Co., hereinafter referred to as Texas. The contract provided that Texas had the right to purchase all of the stock of Mineral owned by the petitioner or the mineral lands and rights owned by Mineral for the sum of $3,750,000. Texas could retain the option from year to year until 1935 by paying $300,000 on August 1, 1930, and $125,000 on the first day of August in each succeeding year, up to and including August 1, 1934. Texas could make the purchase at any time by paying the purchase price. All of the annual payments were to be credited as a part of the purchase price in case the option was exercised. There was a provision for continuing the option beyond August 1, 1935, by the payment of $150,000 on the first day of August of each year, but those payments were not to be credited as a part of the purchase price. Texas was permitted to explore the lands and remove ore for test purposes. Texas was not obligated to make further payments in case it failed to exercise the option and allowed it to lapse, but in that event the petitioner "shall retain" all payments already made.

The first payment of $300,000 was received on or about August 1, 1930. A second payment of $125,000 was received on or about August 1, 1931. The contract was not carried out precisely in accordance with its terms. Several supplemental contracts were entered into in order to include additional lands to be acquired by advances from the purchaser, to provide for the placing of a deed in escrow, and to provide for some changes in the payments to be made in order to continue the option. Advances of small amounts were made, additional lands were acquired, and deeds were placed in escrow. The Texas Co. failed to make a required payment of $125,000 on August 1, 1932. But thereafter, on September 21, 1932, a supplemental contract was entered into which continued the option, with some modifications or changes, and by this and other supplemental contracts,

the last of which was entered into on August 1, 1933, the time for further payment was extended until February 1, 1934. No further payment was ever made. The Texas Co. notified the petitioner in writing on December 26, 1933, that the option would not be exercised, no further continuance was desired, and repayment of advances made for the purchase of additional lands was demanded. The payments and expenditures made by Texas and its subsidiary were charged off their books as a loss at that time. Early in the following year, the escrow deeds were returned to the petitioner and the advances were returned to the Texas Co.

When the Texas Co. abandoned the option in 1933, the $425,000 theretofore received by the petitioner was freed of the requirement that it be applied as a part of the purchase price in case of the exercise of the option. Those two payments had been mentioned in the original consolidated returns filed for 1930 and 1931 as nontaxable income, representing amounts received under an option agreement covering the sale of real property. Amended consolidated returns for 1930 and 1931 were filed on May 10, 1934, in which the above stated amounts were included in taxable income for the years in which received. The tax shown to be due by those amended returns was paid. The petitioner and its affiliates kept their books and made their income tax returns in accordance with an accrual method of accounting.

Mineral had acquired the properties prior to March 1, 1913. The fair market value of the properties on March 1, 1913, was in excess of cost and both the cost and the fair market value on March 1, 1913, were in excess of $425,000.

The Commissioner in determining the deficiencies included in the consolidated income for 1933 the total payments of $425,000 received in 1930 and 1931 under the agreement. He explained that the transaction was not completed for income tax purposes until Texas, in 1933, surrendered its rights under the option to buy the lands and to have the payments in question applied as a part of the purchase price. He held that the entire amount was realized as income in 1933. He then scheduled an overassessment for the income taxes paid on the $425,000 under the amended returns filed for 1930 and 1931. The issue for decision is whether those two payments received in 1930 and 1931 were taxable income for 1933.

The petitioner argues that the payments were either income when received, or were a return of capital which should have been irrevocably applied as a recovery of a part of the basis of the property, so that in neither event would the payments represent income in 1933. Neither of these arguments offers a proper solution of this case. It was impossible to tell in 1930 and 1931, when the payments were received, whether they would ultimately represent income to

the petitioner or a return of capital. They were to be applied against the purchase price in case of the exercise of the option. Had the option been exercised, they would have represented a return of capital, that is, a recovery of a part of the basis for gain or loss which the property had in the hands of the seller. In that event they would not have been income and their return as income when received would have been improper. Cf. *Higgins Estate, Inc.*, 30 B. T. A. 814. But in case of termination of the option and abandonment by the Texas Co. of its right to have the payments applied as a part of the purchase price, it would be apparent for the first time that the payments represented clear gain to the petitioner. In that case, since no property would be sold, there would be no reason to reduce the basis of that retained.

Thus it was impossible for either the taxpayer or the Commissioner to determine in 1930 and 1931 whether or not the payments would eventually represent income and how they should be reported. Obviously those years could not be held open for income tax purposes to await the final outcome of such contracts. The taxpayer in this case, after the option to purchase had been surrendered, filed amended returns reporting the payments as income for the years in which received. But returns must be filed in the light of facts known at the time the returns are due. Some other taxpayer might not choose to file amended returns. Then the statute of limitations would foreclose the Commissioner and prevent the collection of taxes lawfully due. If the Commissioner is to make an orderly and uniform collection of taxes in such cases, the tax liability for those earlier years must be determined and closed by collection, without waiting to see whether or not the option is exercised.

Thus it is necessary to exclude such payments from the income of the year in which received and to include them for the later year when, for the first time, a satisfactory determination of their character for income tax purposes can be made. The other party to the contract in the taxable year for the first time released and abandoned its right under the agreements to have the payments applied against the purchase price, and charged off its loss. The recipient then knew for the first time that it could retain the payments without any obligation to apply them against the purchase price. Its property was then free of the option. It had lost nothing, but had retained everything with which it started and had acquired $425,000 in addition. The $425,000 was then income.

The taxpayer argues that, since the funds were received in 1930 and 1931 with the right to retain them forever and to use them without restriction, they should have been accrued as income for those years. Although they were received without any obligation to re-

turn them, there was one condition attached to their receipt. That is, they had to be applied against the purchase price in case the option was exercised. That one condition is the determining factor in this case. Until it was removed in 1933, the question of the liability of the recipient for income tax upon the payments had to be held in abeyance. Similar cases of forfeiture arise under contracts of sale and are treated the same way. *Calvin T. Graves*, 17 B. T. A. 1318; *Henry Heldt*, 16 B. T. A. 1035; *Nat Webb, Jr.*, 22 B. T. A. 1249; *Laurens Trust Co.*, 3 B. T. A. 331; *Home State Bank*, 15 B. T. A. 121; *Title & Trust Co.*, 33 B. T. A. 25; *Joseph Frost*, 37 B. T. A. 190.

Since the petitioner never elected to use the installment method of reporting its profit from the proposed sale, the possibilities of the use of that method need not be discussed. The argument is made that the payments were solely for the purpose of retaining the option and, since the option cost the petitioner nothing, the payments were pure gain at the time received. If this argument were supported by the facts it would be unanswerable, but the facts show that these particular payments were not merely for the purpose of continuing the option[1] but were to be a part of the purchase price in case the option was exercised. Cases involving royalties are distinguishable. Royalties have been held to be income at the time received where they represent a payment for the right to remove or use some of the property even though they are to be applied against the purchase price. The owner, of course, offsets this income by depreciation and depletion deductions which permit him to recover his basis tax-free despite the fact that the entire amount of the royalties is included in income. Here the payments were not of that character. The method originally adopted by the petitioner in reporting these payments and that adopted by the Commissioner are consistent and proper.

The final argument advanced by the petitioner is that the option, under which payments aggregating $425,000 were made, lapsed in 1932, and, if the Commissioner's theory that gain was realized on the option when it expired is correct, the income in this case was realized in 1932 rather than in 1933. It is true that the payment of $125,000 due on August 1, 1932, was not paid, but shortly thereafter in that same year the parties, by further agreement, revived the option and continued it, so that the payments theretofore made were not forfeited at that time. The petitioner at the end of that year still could have been required to apply these payments as a part

---

[1] The agreement provided for payments of $150,000 annually merely to continue the option after August 1, 1935. Had any such payment been made it could have been income for the year received because it was in no event to be applied as a part of the purchase price.

of the purchase price in case the Texas Co. later chose to exercise its existing rights under the option to buy the property.

Reviewed by the Board.

*Decision will be entered for the respondent.*

---

LEECH, dissenting: The problem here is whether the taxpayer realized taxable gain, and its amount, in 1933, because of the release, in that year, of the taxpayer's conditional obligation to sell the Texas Co. real estate at a certain price. In deciding this question, doubt, if any there be, must be resolved in favor of the taxpayer.[1]

The annual period is fundamental in income tax law and its administration.[2] Thus, money received by a taxpayer, as its own, subject to its unfettered command—which no contingency can affect—constitutes gross income for the year of such receipt. It is either returned capital or gain or both.[3] The holding of the majority not only grossly distorts income but directly contradicts that principle.

The rule is apparently recognized in one paragraph with this sentence:

* * * If the Commissioner is to make an orderly and uniform collection of taxes in such cases [the proceeding at bar], the tax liability for those earlier years must be determined and closed by collection, without waiting to see whether or not the option is exercised.

But, in the very next paragraph, the law thus invoked is violated. It is said:

Thus it is necessary to exclude such payments from the income of the year in which received and to include them for the later year when, for the first time, a satisfactory determination of their character for income tax purposes can be made. * * *

The opinion then proceeds to "exclude" the disputed payments from income for the respective years of their receipt and taxes them to the recipient in a later year when nothing could or did happen, changing, in any way, the taxpayer's unconditional right to such payments which the taxpayer had possessed, absolutely, since it received them. In doing this, the opinion labors but fails to escape an inevitable dilemma. That is, to reach its result, the majority must decide either that these contested payments were forfeited to the petitioner in 1933, or that the money value to the taxpayer of the release, in that year, of its obligation to sell property to the Texas

---

[1] *Gould* v. *Gould*, 245 U. S. 151.

[2] See *Burnet* v. *Sanford & Brooks Co.*, 282 U. S. 359.

[3] *Brown* v. *Helvering*, 291 U. S. 193; *Burnet* v. *North American Oil Consolidated*, 286 U. S. 417; *Blum* v. *Helvering*, 74 Fed. (2d) 483; *Burnet* v. *Logan*, 283 U. S. 404; *Commissioner* v. *Speyer*, 77 Fed. (2d) 824; *Jennings & Co.* v. *Commissioner*, 59 Fed. (2d) 32; *Automobile Underwriters Inc.*, 19 B. T. A. 1160.

1

01

Co., is determined, conclusively, by the sum of those payments. Since neither premise is sound, the conclusion the opinion reaches is wholly untenable.

Thus, the first alternative, namely: that the two annual payments, the one of $300,000 made in 1930 and the other of $125,000 made in 1931, were forfeited in 1933 at the time the Texas Co. notified the petitioner that it would not exercise the option, is obviously impossible to sustain. These funds were the absolute property of the taxpayer since their receipt in 1930 and 1931. Nothing could or did occur in 1933 or at any other time, changing that controlling fact. So there neither was nor could have been a forfeiture of such funds in 1933, the year before us.

And the second alternative is just as clearly wrong. It is evident that, if the release, in the tax year, of the taxpayer's obligation to convey real estate, did result in taxable gain, that gain, if any, would not be measured by the amount of the contested payments, as the respondent and the majority have done. That gain would be measured, only, by the *monetary value of the release* to the taxpayer when the release occurred. That would be the only realized gain. And that value, in turn, would be the excess of the fair market value of the property at the time the taxpayer's obligation was released, over the price at which the taxpayer was obligated to convey it. The taxpayer would then have realizable asset value in that amount freed to it by the release.[4]

No evidence appears in this record that the fair market value of the property at the time the option was released, exceeded the option price. Therefore, there is no evidence here of gain realized through the release of the option and the taxpayer would be entitled to a judgment of no deficiency.[5]

None of the authorities cited in the prevailing opinion is in point. The *Higgins* case [6] might be so if the present contract were a sale agreement and not a mere option. But even then it would contradict the prevailing view that the funds in dispute were neither capital nor gain when received.

Undoubtedly the pending contract, covering the later years, where the annual payments were not to be credited against purchase price, constituted only an option. So too, I think, it was for the earlier years, when such payments were to be so credited. The only effect of the latter condition was to decrease the purchase price if the option were exercised in those earlier years. That price was just as definite whether or not that condition was applicable. The taxpayer parted

[4] See *United States* v. *Kirby Lumber Co.,* 284 U. S. 1.
[5] *Helvering* v. *Taylor,* 293 U. S. 507.
[6] *Higgins Estate, Inc.,* 30 B. T. A. 814.

with nothing more and the Texas Co. received nothing more because of it. With or without the condition, the taxpayer did not sell any title in the property nor did the Texas Co. acquire any. This is obvious because, under the contract, no payment made by the Texas Co. to the petitioner could be a part of the consideration for the optioned property *unless and until* the option was exercised and the property purchased.[7] But, the option was not exercised and the property was not purchased.

So, I think the answer here is that the taxpayer sold a bare option in 1930 for $300,000, and extended that option in 1931 for $125,000. Since it had no cost or other basis for either the option or its extension, those amounts are taxable as income in their entirety for the respective years when the taxpayer received them. In its amended returns for those years, the taxpayer so treated them, and paid the resulting income taxes. In my judgment, that was right.

DISNEY agrees with this dissent.

---

[7] *Helvering* v. *San Joaquin Fruit & Investment Co.,* 297 U. S. 496.