# United States Tax Court

161 T.C. No. 9

ESTATE OF ANDREW J. McKELVEY, DECEASED, BRADFORD G.
PETERS, EXECUTOR,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,[1]
Respondent

————

Docket No. 26830-14.                           Filed November 2, 2023.

————

Decedent (D) entered into variable prepaid forward contracts (first set of VPFCs) with two investment banks in 2007. Pursuant to the terms of the first set of VPFCs, the investment banks made cash payments to D, and D was obligated to deliver variable quantities of stock or their cash equivalent to the investment banks on specified future settlement dates in 2008 (original settlement dates). Treating the execution of the first set of VPFCs as an open transaction, D did not report any gain or loss for 2007 in connection with entering into the first set of VPFCs.

In 2008, before the original settlement dates, D paid consideration to the investment banks to exchange the first set of VPFCs for an amended set of VPFCs that had settlement dates in 2010 (second set of VPFCs). Treating the first set of VPFCs as remaining open after the exchanges, D did not report any gain or loss for 2008 with respect to those VPFCs as a result of the exchange. Later in 2008, and after the exchanges, D passed away. R determined with respect to D's 2008 tax year that the exchanges of the VPFCs constituted sales or exchanges of

————

[1] This opinion supplements our previously filed opinion *Estate of McKelvey v. Commissioner*, 148 T.C. 312 (2017), *reversed and remanded*, 906 F.3d 26 (2d Cir. 2018).

property under 26 U.S.C. § 1001, that the exchanges also resulted in constructive sales under 26 U.S.C. § 1259 of the stock shares D used to collateralize the first set of VPFCs, and that, as a result, D should have reported gain from the transactions.

In *Estate of McKelvey v. Commissioner* (*Estate of McKelvey I*), 148 T.C. 312 (2017), we held that D's treatment of the first set of VPFCs as remaining open after the exchanges was appropriate and that the exchanges constituted neither the sale nor the exchange of property under 26 U.S.C. § 1001 nor resulted in constructive sales of stock under 26 U.S.C. § 1259. Consequently, we concluded D did not have gain from the exchanges with respect to 2008. In *Estate of McKelvey v. Commissioner* (*Estate of McKelvey II*), 906 F.3d 26 (2d Cir. 2018), the U.S. Court of Appeals for the Second Circuit reversed, determining that the exchanges of the VPFCs terminated the first set of VPFCs and resulted in the constructive sale of stock under 26 U.S.C. § 1259. The Second Circuit remanded for us to determine whether the exchanges terminated D's underlying obligations with respect to the first set of VPFCs for purposes of 26 U.S.C. § 1234A and, if so, the amount of D's gain from the termination. The Second Circuit also remanded for us to determine D's gain with respect to the constructive sale of stock under 26 U.S.C. § 1259, an amount which the parties subsequently stipulated.

In the light of the Second Circuit's decision in *Estate of McKelvey II*, we reach the following holdings.

*Held*: Upon the exchange of the first set of VPFCs for the second set of VPFCs, the first set of VPFCs was closed and D's underlying obligations with respect to that first set terminated for purposes of 26 U.S.C. § 1234A.

*Held, further*, D realized $71,668,034 of short-term capital gain for tax year 2008 from the exchange of VPFCs.

––––––––––

*Robert A. Rudnick*, *Kristen M. Garry*, *Mark D. Lanpher*, and *Nathan K. Tasso*, for petitioner.

*Steven N. Balahtsis, Steven A. Sirotic, Francesca M. Ugolini, Elizabeth P. Flores, Michael A. Sienkiewicz,* and *Clint A. Carpenter,* for respondent.

## SUPPLEMENTAL OPINION

MARSHALL, *Judge*:[2]  This case is before the Court on remand from the U.S. Court of Appeals for the Second Circuit for further consideration consistent with its opinion in *Estate of McKelvey v. Commissioner* (*Estate of McKelvey II*), 906 F.3d 26 (2d Cir. 2018), reversing and remanding our decision in *Estate of McKelvey v. Commissioner* (*Estate of McKelvey I*), 148 T.C. 312 (2017).

In *Estate of McKelvey I*, we considered whether Andrew J. McKelvey (decedent) realized over $200 million in short-term and long-term capital gain pursuant to sections 1001 and 1259, respectively, by executing amendments extending two variable prepaid forward contracts (VPFCs) in 2008 (year at issue).[3]  In so doing, we rejected respondent's contention that decedent's execution of the extensions constituted taxable exchanges of "property" under section 1001. *Estate of McKelvey I*, 148 T.C. at 320–32.  We also rejected his contention that the extensions resulted in constructive sales under section 1259 of the collateralized stock shares decedent pledged under the VPFCs. *Estate of McKelvey I*, 148 T.C. at 332–33.  We thus concluded that the extensions did not trigger any capital gain for the year at issue. *Id.* at 320–33.

In *Estate of McKelvey II*, the Second Circuit agreed with us that decedent's execution of the extensions did not constitute exchanges of "property," such that no short-term capital gain was triggered pursuant to section 1001. *Estate of McKelvey II*, 906 F.3d at 34.  However, it also considered a new, alternative argument by respondent that the extensions nevertheless triggered short-term capital gain under section

---

[2] By order of the Chief Judge, this case was reassigned from Judge Robert P. Ruwe to Judge Alina I. Marshall for disposition.

[3] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.  Some monetary amounts are rounded to the nearest dollar.

1234A by terminating decedent's obligations under the original VPFCs.[4] *Estate of McKelvey II*, 906 F.3d at 34–35. With respect to this argument, the Second Circuit concluded that, although not exchanges of "property" for purposes of section 1001, the original VPFCs were exchanged for amended VPFCs. *Estate of McKelvey II*, 906 F.3d at 34–35. It correspondingly remanded the case for us to determine "whether the replacement of the obligations in the original VPFCs with the obligations in what we hold are new contracts satisfies the criteria for a termination of obligations that gives rise to taxable income, presumably capital gain, and the amount of such gain." *Id.* at 35; *see also id.* at 41 (directing the Court, more succinctly, to determine "whether the termination of obligations that occurred when the amended contracts were executed resulted in taxable short-term capital gains").

Additionally, the Second Circuit reversed our holding as to section 1259, concluding that the extensions did result in constructive sales of the collateralized shares that triggered long-term capital gains. *Estate of McKelvey II*, 906 F.3d at 40–41. In the light of this conclusion, the Second Circuit further mandated that we calculate the amount of such gain. *Id.* at 41. The parties having subsequently stipulated that amount as $102,406,962.12, only the issues identified by the Second Circuit with respect to the "replacement of the obligations in the original VPFCs with the obligations in . . . [the] new contracts" remain.

In the light of the Second Circuit's holdings, we will refer to the transactions at issue as "replacements" or "exchanges" for the remainder of this Opinion.

*Background*

The facts material to the issues under consideration have already been set forth in *Estate of McKelvey I*.[5] For convenience, we restate them here.

---

[4] The parties agreed the Second Circuit could consider this argument because petitioner had asserted before this Court that the extensions did not result in a termination of decedent's obligations under the original VPFCs. *Estate of McKelvey II*, 906 F.3d at 34.

[5] This case was submitted fully stipulated under Rule 122, and in *Estate of McKelvey I* we incorporated by reference the parties' First Amended, Second, and Third Stipulations of Facts and attached Exhibits. *Estate of McKelvey I*, 148 T.C. at 313. In briefing the case for remand, respondent requested additional findings of fact,

At the time the Petition was filed, Bradford G. Peters had been appointed executor of decedent's estate by the Surrogate's Court of the State of New York, New York County.[6]

Decedent was the founder and chief executive officer of Monster Worldwide, Inc. (Monster), a company known for its website, monster.com. Monster.com helps inform job seekers of job openings that match their skills and desired geographic location. Decedent died on November 27, 2008. Bradford G. Peters is the executor of decedent's estate.

I.     *Bank of America*

Effective September 11, 2007, decedent entered into a VPFC with Bank of America, N.A. (BofA), with respect to 1,765,188 shares of Monster class B common stock owned by decedent (BofA VPFC).[7] Pursuant to the terms of the BofA VPFC, decedent received from BofA a cash prepayment of $50,943,578.31 on September 14, 2007. In exchange, decedent agreed to deliver to BofA, over the course of ten separate settlement dates in September 2008, up to 1,765,188 Monster shares or the cash equivalent. The actual number of Monster shares (or the cash equivalent) required for delivery on each settlement date would vary according to the stock market closing price of Monster shares on each specified settlement date. Three different scenarios were contemplated in the BofA VPFC. If the Monster stock closing price on a particular settlement date was less than or equal to $30.4610 per share (BofA floor price), the number of Monster shares (or cash equivalent) deliverable to BofA on the settlement date would be as follows:

| Settlement Date | Monster Shares Deliverable to BofA |
| --- | --- |
| 9/11/08 | 176,518 |
| 9/12/08 | 176,518 |

proposing valuations for the VPFCs both before and after the exchange. The valuations, but for a few rounding differences, align with the valuations which both parties stipulated in the Third Stipulation of Facts. We therefore decline respondent's request.

[6] The parties stipulate that at the time the Petition was filed, petitioner's address was in West Islip, NY.

[7] At the close of trading on the National Association of Securities Dealers Automated Quotation (NASDAQ) on September 11, 2007, the share price of Monster was $32.91.

| | |
|---|---|
| 9/15/08 | 176,519 |
| 9/16/08 | 176,519 |
| 9/17/08 | 176,519 |
| 9/18/08 | 176,519 |
| 9/19/08 | 176,519 |
| 9/22/08 | 176,519 |
| 9/23/08 | 176,519 |
| 9/24/08 | 176,519 |

If the Monster stock closing price on a particular settlement date was greater than the BofA floor price but less than or equal to $40.5809 per share (BofA cap price), then the number of Monster shares (or cash equivalent) deliverable to BofA would be the product of:

$$176{,}519 \quad \times \quad \frac{\text{BofA floor price}}{\text{Stock closing price}}$$

The multiplier used for the September 11 and 12, 2008, settlement dates is 176,518 instead of 176,519.

If the Monster stock closing price on a particular settlement date was greater than the BofA cap price, then the number of Monster shares (or cash equivalent) deliverable to BofA would be the product of:

$$176{,}519 \quad \times \quad \frac{\text{BofA floor price} + \text{Stock closing price} - \text{BofA cap price}}{\text{Stock closing price}}$$

The multiplier used for the September 11 and 12, 2008, settlement dates is 176,518 instead of 176,519.

On each settlement date, decedent could elect to settle the VPFC by delivering the requisite number of Monster shares or the cash equivalent. Decedent pledged 1,765,188 Monster shares to BofA to secure his obligations under the BofA VPFC but could substitute other collateral, subject to BofA's approval, at any time during the term of the VPFC.

On July 24, 2008, decedent paid BofA $3,477,949.92 in additional consideration to extend the BofA VPFC settlement dates (BofA extension), as follows:[8]

| Original BofA Settlement Date | Extended BofA Settlement Date |
|---|---|
| 9/11/08 | 2/1/10 |
| 9/12/08 | 2/2/10 |
| 9/15/08 | 2/3/10 |
| 9/16/08 | 2/4/10 |
| 9/17/08 | 2/5/10 |
| 9/18/08 | 2/8/10 |
| 9/19/08 | 2/9/10 |
| 9/22/08 | 2/10/10 |
| 9/23/08 | 2/11/10 |
| 9/24/08 | 2/12/10 |

The BofA extension further provides: "Except as amended herein, all other terms and conditions of the . . . [BofA VPFC] shall remain in full force and in effect."

Following decedent's death, petitioner settled the BofA VPFC by delivering to BofA 1,757,016 shares of Monster stock on or about May 8, 2009.[9]

II. *Morgan Stanley*

Effective September 24, 2007, decedent entered into an agreement with Morgan Stanley & Co. International plc (MSI), with respect to 4,762,000 shares of Monster common stock (MSI VPFC).[10] Pursuant to the terms of the MSI VPFC decedent received from MSI a

---

[8] At the close of trading on the NASDAQ on July 24, 2008, the share price of Monster was $18.24.

[9] It appears that the original BofA VPFC provided for expedited settlement upon the occurrence of certain default or termination events, such as decedent's death. Neither party attaches any significance to the fact that there was an event triggering settlement before the contractually specified dates.

[10] At the close of trading on the NASDAQ on September 24, 2007, the share price of Monster was $33.47.

cash prepayment of $142,626,185.80 on September 27, 2007. In exchange, decedent agreed to deliver to MSI, on or about September 24, 2008, up to 4,762,000 Monster shares or the cash equivalent. The actual number of Monster shares (or cash equivalent) required for delivery would vary according to the average closing price of Monster stock on specified dates (averaging dates). The averaging dates used to calculate the number of deliverable shares under the MSI VPFC were the same ten settlement dates used in the original BofA VPFC.

Similarly to the BofA VPFC, three different scenarios were contemplated in the MSI VPFC. If the average closing price of Monster stock over the ten averaging dates was less than or equal to $30.894 per share (MSI floor price), then decedent would be required to deliver to MSI 4,762,000 Monster shares or the cash equivalent. If the average closing price of Monster stock over the ten averaging dates was greater than the MSI floor price but less than or equal to $35.772 per share (MSI cap price), then the number of Monster shares (or cash equivalent) deliverable to MSI would be calculated using the following formula:

$$\frac{4{,}762{,}000 \times \text{MSI floor price}}{\text{Stock average price}}$$

If the average closing price of Monster stock over the 10 averaging dates was greater than the MSI cap price, then the number of Monster shares (or cash equivalent) deliverable to MSI would be calculated using the following formula:

$$4{,}762{,}000 \quad \times \quad \frac{\text{MSI floor price + average price – MSI cap price}}{\text{Stock closing price}}$$

The terms of the MSI VPFC, like the terms of the BofA VPFC, provided that decedent could elect to settle the contract either by delivering the requisite number of Monster shares or by paying the cash equivalent. Decedent pledged 4,762,000 Monster shares to secure his obligations under the MSI VPFC but could substitute other collateral, subject to MSI's approval, at any time during the term of the MSI VPFC.

On July 15, 2008, decedent paid MSI $8,190,640 in additional consideration to extend the MSI VPFC averaging and settlement date(s)

(MSI extension).[11] Pursuant to the terms of the MSI extension decedent and MSI postponed the settlement date of the MSI contract from September 24, 2008, to January 15, 2010. The MSI extension also postponed the ten averaging dates to be used for the calculation of the average closing price, as follows:

| *Original MSI Settlement Date* | *Extended MSI Settlement Date* |
|---|---|
| 9/11/08 | 1/4/10 |
| 9/12/08 | 1/5/10 |
| 9/15/08 | 1/6/10 |
| 9/16/08 | 1/7/10 |
| 9/17/08 | 1/8/10 |
| 9/18/08 | 1/11/10 |
| 9/19/08 | 1/12/10 |
| 9/22/08 | 1/13/10 |
| 9/23/08 | 1/14/10 |
| 9/24/08 | 1/15/10 |

The MSI extension further provides: "This Confirmation supplements, forms part of, and is subject to, the . . . [MSI VPFC] . . . between you and us. All provisions in the . . . [MSI VPFC] govern this Confirmation except as expressly modified below."

Following decedent's death, petitioner settled the MSI VPFC by delivering to MSI 4,762,000 shares of Monster stock on or about August 5, 2009.[12]

---

[11] At the close of trading on the NASDAQ on July 15, 2008, the share price of Monster was $17.28.

[12] It appears that the original MSI VPFC, like the original BofA VPFC, provided for expedited settlement upon the occurrence of certain default or termination events, such as decedent's death. Neither party attaches any significance to the fact that there was an event triggering settlement before the contractually specified dates. Petitioner received a $95,240 credit from MSI at settlement, and the parties do not explain and it is unclear from the record why MSI credited this amount.

III.   *Tax Return*

Petitioner timely filed Form 1040, U.S. Individual Income Tax Return, for decedent's taxable year 2008. On August 14, 2014, respondent issued a notice of deficiency to petitioner for decedent's taxable year 2008. Respondent determined in the notice of deficiency that decedent, upon executing the BofA and MSI extensions in 2008, realized capital gain of $200,886,619. Respondent's determined gain comprised: (1) decedent's realization of short-term capital gain of $88,096,811.03 from his exchange of the VPFC extensions (amended, or second set of, VPFCs) for the original VPFCs (first set of VPFCs);[13] and (2) decedent's realization of $112,789,808.64[14] of long-term capital gain from the constructive sales of Monster shares pledged under the VPFCs.[15] Respondent's determination of long-term capital gain is based on decedent, as the founder of Monster, having a zero basis in the Monster shares pledged as collateral to BofA and MSI.[16] Petitioner timely filed a Petition with the Court disputing respondent's determinations in the notice of deficiency.

*Discussion*

I.   *Taxability of the Replacement of Obligations*

The first question we have been asked to address is whether a taxable termination of obligations occurred when decedent exchanged VPFCs with BofA and MSI, resulting in taxable gain. The Second Circuit opined briefly on the exchanges, holding that the extensions of

---

[13] Respondent's computation of short-term capital gain is based on (1) decedent's holding period for the original VPFCs before extension and (2) an amount realized for each original VPFC equal to the product of (i) the number of Monster shares pledged as collateral and (ii) the excess of the floor prices under the original VPFCs over the Monster closing price on July 15, 2008, of $17.28 per share

[14] In *Estate of McKelvey I*, 148 T.C. at 318, this amount was misstated as $112,789,808.03.

[15] Respondent's computation of long-term capital gain is based on (1) decedent's long-term holding period for the Monster shares and (2) an amount realized equal to the product of (i) the number of Monster shares pledged as collateral under the original VPFCs and (ii) the Monster closing price on July 15, 2008, of $17.28 per share.

[16] Pursuant to a 2010 settlement between the Internal Revenue Service (IRS) Office of Appeals and petitioner regarding decedent's taxable year ending December 31, 2002, decedent recognized capital gain of $12,077,427 with respect to 2,500,000 Monster shares. Neither party addresses the impact, if any, of this capital gain recognition on the VPFC transactions, and therefore we do not consider it.

the valuation dates resulted in the replacement of the original contracts. *Estate of McKelvey II*, 906 F.3d at 35. More specifically, the Second Circuit concluded that extending the valuation dates by an additional 17 months for the BofA contracts and 16 months for the MSI contracts resulted in amended contracts that replaced the original contracts. *Id.* The Second Circuit reasoned that the parties "changed the bets that the VPFCs represented", which it determined to be a "fundamental change," invoking a phrase from Revenue Ruling 90-109, 1990-2 C.B. 191. *Estate of McKelvey II*, 906 F.3d at 35. Revenue Ruling 90-109 discusses a change in contractual terms that causes an old contract to be "treated as if" it was actually exchanged for a new one. *See* Rev. Rul. 90-109, 1990-2 C.B. at 192 ("A change in contractual terms effected through an option provided in the original contract is treated as an exchange under section 1001 if there is a sufficiently fundamental or material change that the substance of the original contract is altered through the exercise of the option. Under such circumstances, the old contract is treated as if it were actually exchanged for a new one."); *see also id.* (referring to the exercise of the option as resulting in a change that is "substantively the same as an actual exchange" and as obviating the need for an "actual exchange" but effecting a "de facto exchange"). The revenue ruling employed the phrase "sufficiently fundamental or material change" to indicate the point at which the original contracts had been exchanged for new contracts, a gain recognition event as an exchange under section 1001. *Id.* The Second Circuit ultimately concluded that the extension resulted in an exchange of the first set of contracts for new contracts, as well as an exchange of the underlying obligations. *Estate of McKelvey II*, 906 F.3d at 35.

The Second Circuit stopped short, however, of reaching a holding on whether a termination of obligations occurred. *Id.* On appeal, respondent raised an alternative claim that the exchanges resulted in the termination of derivative obligations with respect to capital assets. *Id.* at 34–35. Respondent argued that such a termination of obligations resulted in short-term capital gain under section 1234A. *Estate of McKelvey II*, 906 F.3d at 34–35. The parties acknowledged that respondent was entitled to raise the new claim, and the Second Circuit left for us to address on remand the issue of whether decedent realized short-term capital gain under section 1234A.

A.      *Termination of the Obligations Under the VPFCs*

The Second Circuit described the exchanges as a "replacement of the obligations," establishing that by executing the transactions,

decedent surrendered one set of obligations and cash in an exchange for an entirely separate set of obligations that, in turn, represented fundamentally changed bets. *Estate of McKelvey II*, 906 F.3d at 35; *see* Rev. Rul. 90-109. In order to determine whether such an exchange qualifies as a taxable termination of the first set of obligations, we turn to guidance regarding the treatment of options contracts.[17] Broadly speaking, an option is the right to buy or sell a stock at a certain price within a set period and involves a buyer (or holder) and a seller (also known as a writer or grantor). *Laureys v. Commissioner*, 92 T.C. 101, 102 (1989). Revenue Ruling 90-109 applies sale or exchange treatment to fundamental changes in the terms of options contracts. *See Estate of McKelvey II*, 906 F.3d at 35. The revenue ruling states that where a change to contractual terms effected through an option provided in the original contract is so substantial as to amount to a fundamental or material change, the "old contract is treated as if it were actually exchanged for a new one." Rev. Rul. 90-109, 1990-2 C.B. at 192. Such treatment is "substantively the same as an actual exchange of contracts and is a sale or other disposition for purposes of section 1001." *Id.*; *see supra* p. 11.

While VPFCs are not options themselves, options are similar, open transactions from which principles can be applied to VPFCs, a shared treatment acknowledged through prior IRS guidance and the Second Circuit. *See* Rev. Rul. 78-182, 1978-1 C.B. 265; Rev. Rul. 58-234, 1958-1 C.B. 279; *see also Estate of McKelvey II*, 906 F.3d at 35 ("The new valuation dates in the amended contracts resulted in new contracts just as new expiration dates for option contracts result in new option contracts."). From the grantor's perspective, the obligations under an option contract terminate, in relevant part, through the grantor's repurchase of the option from the holder or the grantor's purchase of an option with terms identical to the original option granted and designating the purchase as a closing transaction. *Laureys*, 92 T.C. at 102–04; Treas. Reg. § 1.1234-3(b)(1). Each option has its own identity and is a separate asset from all other options, so the holding period of

---

[17] The Second Circuit left the issue of "whether the replacement of obligations . . . *satisfies the criteria for a termination* of obligations that gives rise to taxable income" to be decided by this Court. *Estate of McKelvey II*, 906 F.3d at 35 (emphasis added). The Second Circuit also directed this Court to determine "whether *the termination of obligations that occurred* when the amended contracts were executed resulted in taxable short-term capital gains." *Id.* at 41 (emphasis added). In the light of the former statement and discussion by the Second Circuit, we understand the latter statement to not be a conclusion with respect to whether a termination occurred for purposes of section 1234A.

an option does not relate back to prior option contracts. *Reily v. Commissioner*, 53 T.C. 8, 12 (1969). The time factor goes to the very essence of options contracts. *Id.*

The Second Circuit held that decedent's extensions of the VPFCs represented such fundamental changes as to warrant treatment as if actual exchanges of the old and new contracts had occurred. *Estate of McKelvey II*, 906 F.3d at 35. In treating decedent's extensions of the contracts as if the first set of VPFCs was actually exchanged for the second set of VPFCs, the exchange takes the form of an option repurchase. Decedent made payments to MSI and BofA and undertook obligations as part of the new contracts, in exchange for the termination of the prior contracts. Decedent repurchased the options held by MSI and BofA, thereby executing closing transactions that terminated his obligations with respect to the first set of contracts. *See* Treas. Reg. § 1.1234-3(b)(1)(i); *see also Laureys*, 92 T.C. at 102–04. Decedent's obligations under the first set of VPFCs do not relate forward to his separate obligations under the second set of VPFCs, and likewise the obligations under the second set of VPFCs do not relate back to his obligations under the first set. *See Reily*, 53 T.C. at 12. We therefore find that, upon executing the exchanges, decedent terminated the obligations under the first set of VPFCs.

B.     *Sale Treatment Under Section 1234A*

Although entry into a VPFC is not a taxable event, its termination and replacement are another matter. The Second Circuit established its agreement with our conclusion in *Estate of McKelvey I* that, at the time the VPFCs were extended, decedent did not have any rights in the VPFCs that could constitute property; but instead all that remained were his obligations to deliver Monster shares (or their cash equivalent) such that there was no taxable exchange of "property" for purposes of section 1001. It remanded, however, for us to consider the exchanges of the original VPFCs for the amended contracts in the context of section 1234A.[18] *Estate of McKelvey II*, 906 F.3d at 34–35. Section 1234A, in relevant part, determines the taxable treatment of the termination of obligations with respect to capital assets, providing:

---

[18] In so doing, the Second Circuit was careful to note the parties' agreement that the case concerns contracts that are not debt instruments and that it was making "no implication as to the tax consequences of fundamental changes in debt instruments." *Estate of McKelvey II*, 906 F.3d at 35 n.13.

> Gain or loss attributable to the cancellation, lapse, expiration, or other termination of—
>> (1) a right or obligation . . . with respect to property which is (or on acquisition would be) a capital asset in the hands of the taxpayer
>> . . . .
>
> shall be treated as gain or loss from the sale of a capital asset.

Thus, by its terms, section 1234A(1) applies to the termination of obligations with respect to capital assets, which include derivative or contractual rights to buy or sell such assets. *Pilgrim's Pride Corp. v. Commissioner*, 779 F.3d 311, 317 (5th Cir. 2015), *rev'g on other grounds* 141 T.C. 533 (2013); *see also Estate of McKelvey II*, 906 F.3d at 34 (citing same for its interpretation of section 1234A(1)). A "capital asset" for the purposes of section 1234A means any property held by the taxpayer, with certain exclusions that do not apply here. § 1221(a). And the Second Circuit, to which appeal would lie, has opined that "a gain or loss from the cancellation of a futures or forward contract would result in capital gain or loss pursuant to [section] 1234A." *Wolff v. Commissioner*, 148 F.3d 186, 188 (2d Cir. 1998), *rev'g and remanding on other grounds* T.C. Memo. 1994-196.

Decedent held obligations with respect to Monster shares, which are capital assets under section 1221(a). As the exchanges resulted in the termination of those obligations, we hold that section 1234A(1) applies to the exchanges. Therefore, any gain that decedent realized from the exchanges shall be treated as gain from the sale of a capital asset. "Short-term capital gain" is defined as the gain from the sale or exchange of a capital asset held not more than 1 year. § 1222(1). The period for which a taxpayer has held an option, rather than the property that is the subject of the option, determines whether the capital gain is short term or long term. *See* Treas. Reg. § 1.1234-1(a)(1). Decedent terminated the first set of VPFCs after holding them for less than one year, and consequently any gain that decedent realized from the exchange is short-term capital gain.

II.  *Open Transaction Doctrine*

As previously mentioned, VPFCs are afforded open transaction treatment upon execution. *Burnet v. Logan*, 283 U.S. 404 (1931); Rev. Rul. 2003-7, 2003-1 C.B. 363. Petitioner contends the replacement of VPFCs requires equal treatment under the doctrine. The open

transaction doctrine finds its origins in the Code, which generally concerns itself only with realized gains or losses or with unrealized gains or losses that are reasonably certain and ascertainable. *Lucas v. Am. Code Co.*, 280 U.S. 445, 449 (1930). The doctrine governs transactions where the realization of income is so uncertain or contingent as to prevent accurate gain or loss calculations. *Burnet v. Logan*, 283 U.S. 404. Such limitations mean that the open transaction doctrine applies only when we cannot determine the value of either of the exchanged assets. *Davis v. Commissioner*, 210 F.3d 1346, 1348 (11th Cir. 2000), *aff'g* T.C. Memo. 1998-248; *see also United States v. Davis*, 370 U.S. 65 (1962). In scenarios where the value of only one asset is ascertainable, the exchanged assets are deemed to be of equal value. *Davis v. Commissioner*, 210 F.3d at 1348; *see also Davis*, 370 U.S. at 72.

Petitioner contends that the open transaction doctrine applies to the transactions before us. Petitioner argues that in the exchanges of VPFCs, VPFCs in the second set are open, which renders any gain calculation from the exchanges an impossibility at that time. Petitioner continues that, regardless of whether the Court deems them extensions or replacements, the gain amount, identity, and cost basis of the property to be delivered remained undetermined when the amendments were executed. By reiterating that the ultimate exchange of cash or property for the prepayment is what is relevant, petitioner makes clear the view that rigid adherence to the settlement options contemplated in the original contracts is the only way that parties to the contracts may calculate their gain.

### A. *Applicability of* Virginia Iron *and* Hicks

Petitioner attempts to support the position that the open transaction doctrine applies with various options-writing cases, primarily relying on *Virginia Iron Coal & Coke Co. v. Commissioner*, 37 B.T.A. 195 (1938), *aff'd*, 99 F.2d 919 (4th Cir. 1938), and *Hicks v. Commissioner*, T.C. Memo. 1978-373, 37 T.C.M. (CCH) 1540. Each case evaluates written call options that were extended at or after expiration, and in each case the Court held that gain or loss was not realized upon extension as uncertainty remained regarding what property would be delivered to the taxpayers' counterparties. *Va. Iron*, 37 B.T.A. 195; *Hicks*, 37 T.C.M. (CCH) 1540. *Virginia Iron*, in relevant part, concerns an option that the taxpayer wrote for a third party to purchase land and mineral rights owned by the taxpayer's subsidiary or stock in the subsidiary owned by the taxpayer. *Va. Iron*, 37 B.T.A. at 196. The option retained the third party's purchase rights for one year in

exchange for an up-front payment of $300,000; the purchase rights could be renewed annually on August 1 for the following five years at a rate of $125,000 per year. *Id.* The third party failed to make a payment on August 1 of the second year, letting the option lapse, but on September 21 of that year entered into a supplemental contract, continuing the option with some modifications. *Id.* The following year, the third party formally declined to exercise the option. *Id.* at 197. The Board of Tax Appeals (BTA) held that the up-front and renewal payments to the taxpayer were not income for the years in which received, but rather income for the year when the option was declined because only then could "a satisfactory determination of their character" be made. *Id.* at 198.

*Hicks*, in relevant part, concerned two real property parcels that the taxpayer and a business partner agreed to sell to a developer. *Hicks*, 37 T.C.M. (CCH) at 1541. The purchase agreement, signed in December 1972, dictated that the developer would purchase the first parcel for $208,598, and would make a downpayment of $25,000 for the second parcel, plus an interest-bearing note for the balance of $189,162. *Id.* The purchase agreement stated that the closing for the second parcel would not be more than one year after the closing for the first parcel; however, the developer could reconvey the second parcel to the taxpayer and his partner at no additional cost. *Id.* If the developer decided to exercise its option to reconvey the second parcel, the taxpayer and his partner would keep the downpayment. *Id.* In November 1973 the developer reconveyed the second parcel, and the parties voided the note for $189,162 and agreed to grant the developer for $10 an option to repurchase the second parcel (purchase option). *Id.* at 1542. The purchase option provided for the developer to purchase the parcel for $204,000 between January 15, 1974, and June 7, 1975, plus $1,200 per month after January 15, 1974. *Id.* The downpayment of $25,000 would be credited against the purchase price if the developer exercised the purchase option. *Id.* The Court held that any gain recognition for the taxpayer with respect to the downpayment should be delayed until the extended option was exercised or lapsed, on the basis that the character of the payment could not be determined until then. *Id.* at 1544.

In citing *Virginia Iron* and *Hicks*, petitioner encourages the Court to ignore whether obligations are "continuing" or "replaced," proposing that such terms are merely irrelevant formalisms. Instead, per petitioner, we should focus exclusively on whether it is possible to determine the amount and character of any gain or loss. While we agree with maintaining a focus on whether the amount and character of any

gain or loss is determinable, we disagree that doing so requires us to act as though the Second Circuit's holding that the obligations were replaced is "irrelevant" and ultimately unnecessary. The option contracts at issue in *Virginia Iron* and in *Hicks* bear a few notable differences from the VPFCs at hand, the first of which is that the BTA in *Virginia Iron* and the Court in *Hicks* did not establish that the expiration and subsequent renewal of the option was a replacement of the option. Indeed, as petitioner stated on brief, the BTA was not focused on such details and did not provide any opinion on the distinction between "continuing" and "replacing" the contract. We, on the other hand, are operating under the established decision that decedent replaced the original set of VPFCs with a distinct second set.

The second difference arises from the underlying property to which the derivative contracts relate. In both *Virginia Iron* and *Hicks*, the options concerned the rights to purchase defined plots of real property for a fixed amount set at the signing of each contract. *Va. Iron*, 37 B.T.A. at 196; *Hicks*, 37 T.C.M. (CCH) at 1541. As time passed, the underlying real property the parties contemplated did not vary in amount or price. Consequently, the bet that the parties made upon signing resembled the position that they continued to hold in subsequent years; the land values did not significantly change and the acres subject to the options remained fixed. *Va. Iron*, 37 B.T.A. at 196; *Hicks*, 37 T.C.M. (CCH) at 1544. The BTA, and later the Court, found that the option renewals left each taxpayer holding an obligation that had not materially changed from what it was before the renewal. *Va. Iron*, 37 B.T.A. at 196; *Hicks*, 37 T.C.M. (CCH) at 1541. The same cannot be said of decedent's obligations. As respondent's expert witness, Henrick Bessembinder, revealed, the VPFCs carried substantially different values depending on the length of time remaining on the contract and on the share price relative to the set strike price. With an eye toward those variables and the depressed value of the Monster shares at the time of extension, the Second Circuit agreed that the change in expiration dates fundamentally altered the bets that the VPFCs represented. As these fundamental changes were not considerations in *Virginia Iron* and *Hicks*, we find those cases to be factually distinct and noncontrolling.[19]

---

[19] This Court relied on *Virginia Iron* in *Estate of McKelvey I* to conclude that open transaction treatment applied to the first set of VPFCs so long as uncertainty existed with respect to the second set of VPFCs. In the light of the Second Circuit's

B.     *Open Transaction Doctrine as Applied to Exchanged Contracts*

Having established that we are not bound to the holdings in *Virgina Iron* and *Hicks*, we turn to petitioner's argument that the VPFCs remained open through their replacement because the gain or loss decedent would realize from the second set of VPFCs could not be calculated at the time of replacement. Petitioner asserts, and we agree, that the first set of VPFCs held uncertainty regarding the property to be delivered at settlement, which led to further uncertainty regarding decedent's tax basis in any gain or loss calculation. However, petitioner also asserts that the replacement of the first set of VPFCs by the second set does not resolve any of this uncertainty as it does not identify or determine decedent's cost basis in the property eventually used to settle the second set of VPFCs. In essence, petitioner's argument is that gain cannot be calculated on the then-closed first set of VPFCs because gain could not yet be determined on the second set of VPFCs; uncertainty replaced with uncertainty does not close the transaction. This argument is at odds with the mechanics of the open transaction doctrine.

As mentioned above, the open transaction doctrine applies only when it is impossible to determine the value of either asset exchanged. *Davis v. Commissioner,* 210 F.3d at 1348. It says nothing of requiring certainty in calculating the eventual gain of every asset or obligation involved. We therefore look to when it is first possible to determine the value of either asset exchanged.

Petitioner points out that, at the time of the exchange, the parties had yet to resolve the contracts in the manner originally contemplated and the stock or cash equivalent remained undelivered. The issue petitioner highlights on brief is whether the exchange "resolved the uncertainties regarding the amount, identity and cost basis of the money or other property to be delivered in exchange for the prepayment," arguing it did not. But the Second Circuit has already made clear that rigid adherence to the original design of the VPFCs is not the only acceptable conclusion to the contracts. By extending the contracts, the parties replaced the first set of VPFCs with the second set, transactions the Second Circuit held to be exchanges of contracts. *Estate of McKelvey II,* 906 F.3d at 35. The exchanges were a trade of decedent's

_____

holding that the exchanges terminated the first set of VPFCs and created a second set of VPFCs that represented different bets, we no longer find *Virginia Iron* to dictate that conclusion in this case.

obligations under the first set of VPFCs for decedent's obligations under the second set of VPFCs, plus additional payments of $8,190,640 to MSI and $3,477,950 to BofA. This termination of the first set of VPFCs also terminated the uncertainty that existed with respect to the identity and the cost basis of the property to be delivered in exchange for the prepayment under those contracts. Decedent satisfied the obligations from the first set of VPFCs by delivering a combination of cash and new obligations to which he was bound. Together, the cash and the new obligations establish a value and a tax basis sufficient to calculate any gain or loss derived from the first set of VPFCs.

It has long been established that gain is not exclusively derived from cash-settled transactions, but rather that gain may be realized from the "exchange of property, payment of the taxpayer's indebtedness, relief from a liability, or other profit realized from the completion of a transaction." *Helvering v. Bruun*, 309 U.S. 461, 469 (1940). Thus, the fact that gain is a portion of the value of property received in the transaction does not negate its realization. *Id.* Decedent made such an exchange of obligations and property between the first and second set of VPFCs and consequently realized the gains or losses from those transactions. As it is possible to determine the values of property and obligations exchanged, and from there to determine the realized gain, the open transaction doctrine does not apply.

Petitioner is correct that the second set of VPFCs, at the time of the exchange, existed as an open transaction. At the time of the exchange, it would have been impossible to calculate the gain from those VPFCs, as decedent was still free to settle the transaction in cash or shares. However, we are not addressing decedent's possible gain from the second set of VPFCs; instead, we merely need their value at the time of the exchanges. The Second Circuit is not directing us to determine decedent's gain with respect to all VPFCs, merely those terminated by way of the exchanges.

III.  *Calculation of Gain*

A.  *Applicability of Section 1001*

Having established that the open transaction doctrine does not apply, and that any gain derived from the transactions is classified as short-term capital gain, we turn to the calculation of decedent's gain at the moments of the exchanges. Section 1001 dictates the method for calculating such gain:

> The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain, and the loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized.

§ 1001(a).

Problems arise in applying that introductory computation paragraph to our facts as the section limits its scope to gain from the sale or other disposition of property. *See id.* Both the Second Circuit and this Court have ruled that decedent's positions with respect to the VPFCs are not property, but rather obligations. *Estate of McKelvey II*, 906 F.3d at 34; *Estate of McKelvey I*, 148 T.C. at 322. The capital gain calculation as codified under section 1001 requires the sale or exchange of property, and decedent's gain from the VPFCs, while derived from a sale or exchange, would seem to be omitted as nonproperty.

Yet strict adherence to the idea that such wording exempts sales or exchanges of VPFCs from gain calculation leaves a gap in the Code's application of capital gain tax treatment when it comes to VPFCs and other nonproperty derivatives. With respect to the treatment of derivatives elsewhere in the Code, the character of the gain and loss does not turn on the classification of the taxpayer's position with respect to the derivative, but rather the property to which the contract relates. Gain or loss attributable to the sale or exchange of a securities futures contract is considered gain or loss from the sale or exchange of the underlying property for purposes of determining the character of the gain or loss, and the property or nonproperty nature of the taxpayer's position does not dictate taxability. § 1234B. The same holds true for the taxability of derivatives as capital assets. Gain or loss from the cancellation or lapse of an obligation with respect to property that is a capital asset in the hands of the taxpayer is treated as gain or loss from the sale of a capital asset, disregarding the nonproperty nature of the obligation. § 1234A. For options holders, gain or loss from the sale or exchange of options in property is considered to have the same character as gain or loss derived from the sale of the underlying property. § 1234(a). For options writers, the gain or loss is treated as gain or loss from the sale or exchange of a capital asset without regard to whether the position is property or an obligation in the hands of the writer. § 1234(b).

These examples paint a clear picture of the Code's priorities when it comes to taxing the gains or losses of derivatives: The nature of the underlying property controls. Even when it is well established that the taxpayer's position with respect to a derivative is not property, the Code dictates that any gain or loss is treated as if derived from property. We will continue to evenly apply that principle to the VPFCs in question. Consequently, the applicability of section 1001(a) is not affected by the nonproperty nature of decedent's position with respect to the VPFCs, but rather by the fact that the underlying shares are property. The underlying Monster shares are property in the hands of decedent, and therefore section 1001(a) applies to gain from the sale or other disposition of derivatives relating to those shares. Where section 1001 restricts gain calculations, either to property or otherwise, we will look to the nature of the underlying shares as a basis for the section's applicability, rather than to the nature of the taxpayer's position.

B.      *Gain Calculation Under Section 1001*

The gain from the exchange is determined under section 1001 and is calculated as the excess of the amount realized over decedent's adjusted basis in the VPFCs. *See* § 1001(a). The amount realized from the exchange is defined as the sum of any money received plus the fair market value of any property received other than money. § 1001(b). Gain or loss is realized from the exchange of property for other property differing materially either in kind or extent and is treated as income or loss sustained. Treas. Reg. § 1.1001-1(a); *see Helvering v. Bruun*, 309 U.S. at 468–69 (applying section 22 of the Revenue Act of 1932, ch. 209, 47 Stat. 169, 178, the predecessor of the current section 61(a), and holding that gain may be derived from the exchange of property, payment of a taxpayer's indebtedness, relief from liability, or other profit realized from the completion of a transaction). When property is exchanged for property in a taxable exchange, the taxpayer is taxed on the difference between the adjusted basis of the property given and the fair market value of the property received. *Williams v. Commissioner*, 37 T.C. 1099, 1106 (1962) (citing *Phila. Park Amusement Co. v. United States*, 126 F. Supp. 184, 188 (Ct. Cl. 1954)).

We calculate decedent's amount realized by taking the prepayment amount he received and subtracting his basis in the transactions, which consists of his payments to the VPFC holders and decedent's outstanding liability as a result of the second set of VPFCs in the moment immediately following the exchanges. The calculation is as follows:

| Item | MSI | BofA | Total |
|------|-----|------|-------|
| Prepayment to Decedent | $142,626,186 | $50,943,578 | $193,569,764 |
| Payment to Effect the Exchange of VPFCs | −8,190,640 | −3,477,950 | −11,668,590 |
| Value of Decedent's Ongoing Obligation Following the Exchange[20] | −79,857,244 | −30,375,896 | −110,233,140 |
| Gain | — | — | $71,668,034 |

Therefore, upon termination of the first set of VPFCs, decedent realized $71,668,034 in short-term capital gain for the taxable year ended December 31, 2008.

IV.    *Conclusion*

We have considered all of the arguments the parties made, and to the extent they are not addressed herein we find the arguments to be moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

[20] The values of decedent's ongoing obligations following the exchange come from the Expert Report of Hendrik Bessembinder, a jointly submitted exhibit prepared by respondent's expert witness, Dr. Bessembinder. Dr. Bessembinder's report, in relevant part, values decedent's obligations under the VPFCs at various relevant times using the Black-Scholes option pricing formula.

The Black–Scholes model is a widely accepted formula for valuing European-style options on liquid assets. It relies on five variables: (1) the exercise price of the option; (2) the market price of the underlying asset; (3) the volatility of the underlying asset; (4) the expiration date of the option; and (5) the risk-free interest rate. The Code does not require us to use the Black-Scholes valuation method, but we think it is a reasonable method for valuing the VPFC obligations here because of its wide acceptance and stipulation by both parties with respect to its use by Dr. Bessembinder. *See 6611, Ltd. v. Commissioner*, T.C. Memo. 2013-49, at \*71 n.34.